**TASTY BAKING COMPANY,**
Plaintiff-Appellant,

v.

**COST OF LIVING COUNCIL et al.,**
Defendants-Appellees.

No. 3–9.

Temporary Emergency Court
of Appeals.

Dec. 22, 1975.

Robert A. Altman, Clifford, Warnke, Glass, McIlwain & Finney, Washington, D. C., with whom S. Gordon Elkins, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., were on the brief, for appellant.

Barrie L. Goldstein, Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before TAMM, Chief Judge, and HASTIE and CHRISTENSEN, Judges.

TAMM, Chief Judge:

The plaintiff-appellant Tasty Baking Company by this appeal challenges the validity, as it unsuccessfully did before the district court, of several decisions and orders of the appellee Cost of Living Council ("CLC") in effect denying appellant's request for an exception from the requirements of those Phase II regulations, promulgated under the Economic Stabilization Act of 1970, *as amended,* 12 U.S.C. § 1904 note (Supp. III 1973), which limited its profit margin, and finding the company in violation of Phase II controls. Appellant alleges that CLC's decisions are invalid because they are arbitrary and capricious, unsupported by substantial evidence, and based on regulations promulgated without compliance with the Administrative Procedure Act. Although we agree with the trial court that the orders rest on substantial evidence, we must reverse the affirmance insofar as the orders rely on invalid regulations promulgated without proper notice several months after Phase II controls were instituted. We also deny appellee's motions to dismiss the appeal as moot and to permit the filing of a counterclaim for the reasons discussed *infra.*

## I. Background

On November 13, 1971, two days before Phase I ended, a new set of price control regulations was issued, referred to as "Phase II." The Phase II regulations were designed "to stabilize prices and rents within the general economic stabilization goals . . . ." *See* Cost of Living Council Order No. 4, 36 Fed. Reg. 20202 (1972).

Under the Economic Stabilization Regulations in effect during Phase II, a manufacturer was permitted to "charge a price in excess of the base price . . only to the extent that the increased price does not result in an increase in its profit margin over that which prevailed during the base period." 6 C.F.R. § 300.12, 36 Fed.Reg. 23976 (1971). Similarly, a retailer or wholesaler was permitted to charge a price in excess of the base if the increased price did not "increase its profit margin over that which prevailed during the base period." 6 C.F.R. § 300.-13(a)(2), 36 Fed.Reg. 23976 (1971). Definitions of the terms "base period" and "profit margin" were contained in 6 C.F.R. § 300.5, 36 Fed.Reg. 23975 (1971) and 37 Fed.Reg. 3914 (1972):

> "Base period" means any two, at the option of the person concerned, of that person's last 3 fiscal years ending before August 15, 1971, and in determining a base period for the purpose of computing a profit margin during a base period, a weighted average of its profits during the two years chosen shall be used.

> "Profit margin" means the ratio that operating income (net sales less cost of sales and less normal and generally recurring costs of business operations, determined before non-operating items, extraordinary items, and income taxes) bears to net sales as supported on the person's financial statement prepared in accordance with generally accepted accounting principles consistently applied.[1]

A profit margin limitation violation was deemed to have occurred if a person's profit margin for the fiscal year in which he made a charge above a base price exceeded his base period profit margin. 6 C.F.R. § 300.54, 37 Fed.Reg. 10494 (1972). If the Price Commission found that a person had violated a profit limitation it could order that person, among other things, to refund the revenues derived from the price increases above base or the dollar value of the excess profit margin, whichever was less. *Id.* at § 300.54(e)(1).

Under 6 C.F.R. § 300.203, 37 Fed.Reg. 20828 (1972), a person was allowed to restate accounting information for business combinations only in accordance with generally accepted accounting principles, consistently applied. Restatement of prior accounts was required for changes accounted for as a pooling of interest, a spin-off, or a split-off; the preamble to Section 300.203 also recognized that for sound business reasons a large number of acquisitions and divestitures which were not accounted for in this manner could also have substantially the same economic impact on the acquiring or divesting firm, and that if the impact of the transaction on a company's base period profit margin was substantial the difference in treatment might be inequitable in certain cases. Accordingly, the Price Commission was authorized to grant such exceptions to its regulations "as may be necessary to prevent or correct a serious hardship or gross inequity," including adjustment of a base period profit margin. 6 C.F.R. § 300.355, 37 Fed.Reg. 20829 (1972).

On October 23, 1972, appellant filed an application for exception relief alleging that a divestiture of its Potato Chip and Pretzel Division had been completed in 1970, and a divestiture of its Silver Nitrate Division, which had been commenced in October 1971, would be completed by the end of appellant's 1972 fiscal year. Appellant alleged that the op-

---

1. This definition originally provided for a ratio of net profits (before taxes) to gross sales. 36 Fed.Reg. 23976 (1971). The amended version quoted in the text was applicable to Tasty Baking Co.

eration of those divisions had a substantially depressive economic impact on its profit margins during the base period years of 1968 and 1969 and requested CLC to restate Tasty's base period profit margin from 6.64% to 7.63% to reflect the divestitures of the two divisions.

On February 5, 1973, appellee issued a decision and order which permitted appellant to restate its base period profit margin to reflect the divestiture of both the Potato Chip and Pretzel Division and the Silver Nitrate Division. That restatement, however, was to be effective only from the start of appellant's 1973 fiscal year. II J.A., Exhibit 3. On February 22, 1973, appellant filed a request for reconsideration, pointing out that the divestiture of the Potato Chip and Pretzel Division was completed in 1970, not 1972 as appellee had indicated in its February 5, 1973 decision. The appellant further indicated that restatement of its base period profit margin properly to reflect divestiture of that division alone would result in an adjusted base period profit margin of 7.26%. Upon reconsideration appellee recognized that it had made an error with respect to the date of the Potato Chip and Pretzel Division's divestiture. Accordingly, appellee granted the appellant an adjusted base period profit margin for 1972 profit margin limitation purposes to reflect that divestiture, but not the divestiture of the Silver Nitrate Division. *Id.*, Exhibit 5. On June 22, 1973, the appellant received from CLC a notice dated June 19, 1973, which stated that a determination had been made that there was probable violation by appellant of its base period profit margin, and following review of appellant's written and oral presentation, appellee concluded that a profit margin violation had indeed occurred. On August 2, 1973, the appellee mandated price reductions to bring appellant into compliance with the Economic Stabilization

Program as interpreted. The filing of this suit in the district court followed.

After the present suit was filed by appellant in the district court, the parties entered into an agreement to reopen appellant's prior unsuccessful request for exception relief. In that request, appellant asked CLC to adjust Tasty's base period profit margin beyond that previously granted for establishing a 1972 profit margin limitation from 7.26% to 7.55%. Appellant claimed that, since the base period years of 1968 and 1969 were its lowest profit margin years during the 26-year operation period (1945–1971), an adjustment to reflect a level of earnings more historically representative was necessitated. Additionally the appellant argued that the base period profit margin must be adjusted to reflect the substantial changes in business operations of its Silver Nitrate Division, an alleged switch to "tolling" practices [2] and the alleged decrease in the Silver Nitrate Division's dollar volume of sales.[3] According to appellant, both of these factors combined to inflate artificially the appellant's actual 1972 profit margin as compared to its base period profit margin. On February 11, 1974, CLC issued a decision and order which reaffirmed the prior decision and order of April 2, 1973. *Id.* Exhibit 16. The district court action resumed following the February 11, 1974 order on cross-motions for summary judgment and the trial judge granted judgment in favor of defendant CLC. Tasty Baking Co. then appealed to this court. Although the original action specified a challenge to the violation order of August 2 and the exception denial of September 28, 1973, subsequent CLC orders relating to Tasty Baking Co.'s request for an exception are also at issue in this case. Also pending before us are two motions by CLC. The first sought dismissal of the appeal on mootness grounds; the second asked permission to

---

**2.** The tolling practices of the Silver Nitrate Division required silver to be purchased by the customer and then brought to the company for processing. This procedure had the advantage of removing company speculation as to the price of silver in customer contracts.

**3.** Appellant states that the tolling practices and gradual divestiture resulted in a drastic reduction of the Silver Nitrate Division gross sales from $3,616,000 in 1971 to only $964,000 in 1972. II J.A., Exhibit 4 at 2.

join the United States as a party and to file an answer and counterclaim. We shall discuss these motions before evaluating the merits of appellant's claim.

## II. Mootness

The first motion before us is CLC's motion to dismiss the appeal as moot.[4] The Economic Stabilization Act expired April 30, 1974. The district court claim was filed in October, 1973, but judgment was not entered until May 30, 1975. Any discussion of mootness must necessarily begin with a close look at the saving clause of the Act and with this court's recent decisions in *United States v. California*, 504 F.2d 750 (Em. App.1974), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975), and its progeny.

Section 218 of the Act provides that "authority to issue and enforce orders and regulations under this title expires at midnight April 30, 1974, but such expiration shall not affect any action or pending proceedings, civil or criminal, not finally determined on such date, nor any action or proceeding based upon any act committed prior to May 1, 1974." We held in *California* that section 218 deprived the federal courts of jurisdiction after April 30, 1974, to entertain actions arising under the Stabilization Act, unless the action was in the nature of a "pending enforcement proceeding" or was based upon a violation of the Stabilization Act committed prior to May 1, 1974. The import of the *California* decision is best understood in light of the particular fact situation presented to the court. The California legislature in 1973 had approved pay raises to become effective in July of that year. Portions of those increases were forbidden by CLC as contrary to the guidelines of Phases III and IV. California complied with

the CLC limitations and refrained from paying the disallowed increases, but after the Act expired in April of 1974, California indicated its intention to pay the increases as mandated by a decision of the California Supreme Court, *Coan v. California*, 11 Cal.3d 286, 113 Cal.Rptr. 187, 520 P.2d 1003 (1974); CLC filed suit in May of 1974 to enjoin California from paying the increases previously rejected. The trial court granted the injunction but this court reversed and remanded for dismissal because the case was moot.

In rejecting the enforcement proceeding filed after expiration of the Act, the court noted prior interpretations of saving clauses like those used in section 218 which limited "pending proceedings, civil or criminal" to pending enforcement proceedings. 504 F.2d at 753–54. Particularly the court refused to hold that a pending civil action brought by California before expiration of the Act to challenge CLC's rulings could serve to penalize the state for employing its judicial remedies by subjecting it to an enforcement proceeding that would otherwise be barred. *Id.* at 755. In addition, the court noted that jurisdiction for the enforcement proceeding could not be based on section 218 saving provisions for violations occurring before expiration since California had been in complete compliance with CLC directives until after the April 30 termination date.[5] *Id.* The panel, however, specifically reserved the question of whether jurisdiction existed in the companion district court case in which California was challenging the orders:

Clearly, the "pending proceeding" upon which jurisdiction of this Court, is to be founded must be the proceeding before it and not another case, even if based on similar facts. *We do not, however, reach the issue raised by*

---

4. CLC's motion is properly a motion to remand to the district court with an order to vacate judgment and dismiss the action as moot. *See State Trial Attorneys Ass'n v. Flournoy*, 522 F.2d 1406 (Em.App.1975).

5. This holding rested in part on the voluntary nature of Phase III controls which specified that only payments contrary to a CLC order constituted violations, in contrast to the stricter regulations of Phase II. 504 F.2d at 751 n.1, 755.

*counsel as to whether jurisdiction is proper in that case.*

*Id.* at 752 n.4 (emphasis added). This question was apparently answered in the negative in two subsequent cases. In *Carpenters 46 County Conference Board v. The Construction Industry Stabilization Committee,* 522 F.2d 637 (Em.App. 1975), and *State Trial Attorneys Association v. Flournoy,* 522 F.2d 1406 (Em.App. 1975), this court relied on *California* to dismiss suits brought by employees to require California to pay the increases rejected by CLC and the companion Construction Industry Stabilization Committee ("CISC"). Both cases has been brought before April 30, but were dismissed because they were not pending enforcement proceedings.

CLC now argues that, despite its desire to have the issues raised in the case *sub judice* resolved at this time, the *California* line of cases precludes a determination of the problems presented. We hold that this case is not moot and is distinguishable from the cases cited.

As the Supreme Court has often pointed out, there is great danger in attempting to apply bare general principles to cases with different factual situations:

It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but

their possible bearing on all other cases is seldom completely investigated.

*Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399–400, 5 L.Ed. 257 (1821). An examination of the cases following *California* reveals that the decisions there, totally supportable in that fact situation, are not required by the facts of this case.

As discussed above, the *California* court expressly reserved resolution of the jurisdictional issue of a collateral challenge to the relevant CLC rulings. The panels facing this issue in *Carpenters 46* and *State Trial Attorneys, supra,* resolved the issue in light of the *California* setting: a state whose actions could no longer be penalized by a new enforcement proceeding and which was not presently subject to penalties imposed by a prior enforcement proceeding.

The case before us is significantly different in two respects. First, Tasty Baking Co. has already been declared in violation of Phase II profit controls and has been ordered to reduce its prices. Having exhausted administrative appeals, Tasty Baking is attempting here to challenge these CLC orders in the collateral proceeding authorized by the Act.[6] Secondly, since this violation occurred in 1972, long before expiration of the Stabilization Act, an enforcement proceeding could be brought now under the second saving provision of section 218. CLC's motion to permit filing of a counterclaim shows that this enforcement proceeding is not only possible, but highly probable. Under these circumstances we find that appellant's claim is a "pending enforcement action" in the sense *California* intended. It is an ongoing review of and attack upon an administrative enforcement order which will be dispositive of any possible judicial

---

**6.** Section 210(a) provides:

Any person suffering legal wrong because of any act or practice arising out of this title, *or any order or regulation issued pursuant thereto,* may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief,

including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages (emphasis added).

*See also* section 211(a), (b) giving the district court and the Temporary Emergency Court of Appeals jurisdiction in these cases.

enforcement proceeding brought directly by the government. The need present in *California* to prevent an otherwise forbidden enforcement procedure is lacking; instead, a holding of mootness in this situation would remove from the company the statutorily granted right to challenge in court a violation finding and CLC order which will serve as the basis for an imminent enforcement proceeding. Since this case does not confront us with the futile situation that existed in *Carpenters 46* and *State Trial Attorneys* of enjoining CLC and CISC actions which can no longer be enforced, neither the statutory scheme selected by Congress nor the Constitutional requirement of "case and controversy" mandates a contrary result. We also note, as do both appellant and appellee, that prompt resolution of the issues before us also serves the interest of judicial economy. For these reasons we deny appellee's motion to dismiss the appeal as moot.

## III. Counterclaim

■ CLC's second motion, recognizing the desirability of resolving the issues presented at this time, attempts to assure that the present case is a "pending enforcement proceeding" by seeking permission to join the United States as a party, to file an answer,[7] and to assert a counterclaim alleging Tasty's violation of its base period profit margin. Memorandum Supporting Appellee's Motion at 3 n. 1. Under section 209 of the Act, CLC may request the Attorney General to bring suit in federal district court to enjoin violations, to command compliance with orders or regulations, or to order restitution of impermissible profits.

CLC argues that the Federal Rules of Civil Procedure permitting amendment

to present a counterclaim omitted through "inadvertence" or "excusable neglect," Rule 13(f), and liberal amending of pleadings, Rule 15, require granting the motion. We disagree. The attempt to avoid a multiplicity of actions by obtaining affirmative "enforcement" relief through a belated counterclaim presented a scant ten days before oral argument hardly justifies the heroic effort to make the United States a partyclaimant for the first time here. Appellee's motion must be denied as not timely. *See generally First National Bank of Cincinnati v. Pepper*, 454 F.2d 626, 635–36 (2d Cir. 1972); *Freeman v. Continental Gin Co.*, 381 F.2d 459, 468–70 (2d Cir. 1967), *rehearing denied.* This denial is issued without foreclosing any claim which may be proper before the district court.

## IV. Merits

### A. *Arbitrary and Capricious*

■ Having disposed of CLC's two motions we turn now to the merits of Tasty Baking Co's. claims. The company raises two basic issues on this appeal: (1) whether CLC's failure to grant the complete exceptions relief sought by Tasty is arbitrary and contrary to the evidence and findings of CLC and (2) whether the finding of a violation by Tasty for 1972 is invalid because it is based on regulations promulgated in contravention of the procedural requirements of the relevant sections of the Administrative Procedure Act. Although we reject Tasty's insistence on mathematical precision in determining when an exception is required to prevent "serious hardship and gross inequity,"[8] we agree that CLC's violation order fails because of procedur-

---

7. CLC had failed to file an answer in the district court because the parties' agreement to reopen the administrative procedure temporarily stayed the action. Upon resuming the dispute in federal court, the parties stipulated the facts and proceeded on cross-motions for summary judgment. CLC now alleges that the failure to file the answer and counterclaim was an inadvertent oversight and thus within the purview of Fed.R.Civ.P. 13(f) and 15.

8. Section 203 of the Economic Stabilization Act prescribed the general standards and crite-

ria that the Council must follow in affording companies exceptions relief. Section 203(b)(2) provided that the Council should issue standards to provide "such general exceptions and variations as are necessary . . . to prevent gross inequities [and] hardships . . . ." This command to create a regulatory escapevalue for possible injustices resulting from the controls was followed in 6 C.F.R. §§ 300.127, 305.30–.38 (1972).

al impairments of the underlying regulations.

The first contention of the appellant is that the action of CLC was arbitrary and in excess of the Council's authority. On the contrary we believe that, to the extent such adjustment was denied, the agency acted rationally, in appropriate pursuance of its authority, and with articulation of reasons adequate to require us to accept its decision with the deference to be accorded agency action in general. *See generally Pacific Coast Meat Jobbers Association, Inc. v. Cost of Living Council,* 481 F.2d 1388, 1391 (Em. App.1973); *United States v. International Brotherhood of Electrical Workers, Local No. 11,* 475 F.2d 1204, 1209 (Em. App.1973); *University of Southern California v. Cost of Living Council,* 472 F.2d 1065, 1068 (Em.App.1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *United States v. Lieb,* 462 F.2d 1161, 1166 (Em.App.1972).

> In reviewing the discharge of an agency's function in interpreting the Act, . . . this court has recognized that where administrative control has been congressionally authorized, the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

*Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391, at 1400 (Em.App. 1975), *quoting Mississippi Valley Barge Co. v. United States,* 292 U.S. 282, 286–87, 54 S.Ct. 692, 78 L.Ed. 1260 (1934).

The appellee in its various decisions and orders recognized that the appellant's unadjusted base period profit margin ("BPPM") was sufficiently below the firm's historical earnings to result in gross inequity. In order to cure that inequity CLC examined the causes underlying that deviation from the historical norm. One such cause was a low profit margin, high sales entity—the Potato Chip and Pretzel Division—which was present as part of the appellant's corporate structure in the base years 1968 and 1969, but not throughout the

entire ten-year index period, 1962 through 1971. The Council granted the appellant relief by allowing a restatement of the BPPM to reflect that divestiture. It refused, however, to allow appellant to adjust further its BPPM for 1972 profit margin limitation purposes to reflect the divestiture of the Silver Nitrate Division which continued in operation through most of 1972.

Appellant's argument that the findings of CLC in the April 2, 1973 Decision and Order are in conflict with the limited relief granted demands too harsh an interpretation of the ambiguous language. The order contained the following findings of fact:

> Upon reconsideration, the Council, in accordance with Regulation 6 CFR 305.36(d), approves in part the exception request based on the demonstration that (1) the divestiture of the company's Potato Chip and Pretzel Division has substantial impact on the base period profit margin, as defined by Phase II Regulation 6 CFR 300.5, and that such divestiture was completed during fiscal year 1970; (2) *the divestiture of the Silver Nitrate Division also has substantial impact upon the Phase II base period profit margin, but that divestiture of this division was not completed until fiscal year 1972;* and (3) *the Tasty Baking Company has demonstrated a serious hardship and gross inequity as a result of compliance with the Economic Stabilization Program.*

II J.A., Exhibit 5 (emphasis added). We accept CLC's explanation of this language. Rather than indicating that the gradual divestiture during 1972 caused a serious hardship entitling Tasty to exceptions relief for 1972, the order simply notes that the previous order allowing a new BPPM for 1973 to reflect both divestitures was proper since complete divestiture, which caused the substantial impact, had been completed by that time.

On reconsideration of its order, CLC evaluated Tasty's claims that the gradual phasing out in 1972 entitled it to fur-

ther relief. The agency concluded that the available data indicated that Silver Nitrate Division's actual operating level during 1972 when measured by silver volume (total ounces of silver handled) equaled approximately 70% of the division's level of transactions during the base years 1968–69, and that the conversion fees charged by the Silver Nitrate Division (calculated by subtracting total silver costs from total annual sales) were at a level in excess of 78% of base year levels. Decision and Order of Feb. 11, 1974, II J.A., Doc. 16 at 5.

During reconsideration of the orders following commencement of this action in the district court, appellee also disallowed appellant's request to restate its base period sales. Tasty had desired to remove the cost of silver from 76% of all base period transactions in order to reflect allegedly substantial changes in the 1972 operations of the Silver Nitrate Division based upon appellant's claim that its switch to tolling practices in the Silver Nitrate Division caused an alleged distortion in its actual 1972 profit margin. Appellee found, however, that the Silver Nitrate Division had started tolling in 1967 and that in 1972 tolling accounted for 76% of such transactions. Employing data furnished by appellant, appellee calculated the probable impact which would have resulted if appellant's level of tolling operations in 1972 had been at the base period level, and concluded that the impact would have been minimal. Such findings were not without substantial support in the record. Appellee's conclusions that neither the phase-out of the Silver Nitrate Division in 1972 nor the extent of tolling operations conducted by the Division in 1972 represented a significant change in the nature or scope of the firm's operations as compared to base year levels are entitled to deference.

Appellant's most compelling argument facially is that CLC's own calculations revealed that the historical profit margin of the company was in fact higher than the relief which was granted and yet it denied appellant the benefit of that finding. CLC acknowledges that the adjust-

ment of the base period profit margin for 1972 to reflect divestiture of the Potato Chip-Pretzel Division in accordance with the April 2, 1973 decision and order should increase the company's profit margin from 6.64% to 7.26%. According to its findings, however, the 10-year weighted average profit margin was 7.31%. Appellant accordingly contends that CLC wrongfully refused to grant it adequate relief as required by its own findings. Responding to the administrative determination that it was enough that the profit margin of 7.26% was "approximately equal to the firm's 10-year weighted average profit margin . .," appellant quips: "In effect the Council said that its decision was almost reasonable." The difference between the two figures, says appellant, represented approximately $50,000 in earnings. It complains that the Council did not even attempt to explain why it concluded that 7.26% was a fair profit margin limitation for the company rather than the 7.31% which it, itself, had calculated to be representative of the company's historical earnings, and cites *Burlington Truck Line, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), to the effect that administrative decisions must be deemed illegal if they fail to "articulate" any rational connection between the facts found and the choice made.

We are inclined to believe that there is sufficient reason for the claimed discrepancy. While the appellee did determine that, without adjustment, the appellant's situation was grossly inequitable, implicit in its final disposition was the conclusion that as adjusted, appellant's position did not present a case of gross inequity or hardship. Appellant's contention that beyond rectifying gross inequities the appellees had the duty to give strict effect to the precise 7.31% figure used as a gauge seems warranted neither in law nor equity. The law required no such exact result but did require the elimination of gross inequity or hardship. Other companies not entitled to any similar adjustments on the ground of gross inequity or hardship must be content with the rough approximations of the general

rule. The determination of the Council that in the avoidance of gross inequity or hardship it had sufficiently approximated an equitable adjustment in the case of appellant should be accepted. "Administrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should not be quick to overturn them." *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391, at 1404 (Em.App.1975). We therefore affirm the trial court's judgment as it upholds orders denying an exception in regard to the Silver Nitrate Division during 1972.

### B.  *Procedural Violations*

Despite the apparent reasonableness of CLC's decision to deny the exception, we are seriously disturbed by its cavalier disregard of procedural requirements. The Economic Stabilization Act of 1970 prescribed the procedural framework for promulgating regulations under the Act. In a deliberate rejection of less strenuous demands,[9] Congress in amending the Act elected to subject regulatory functions to the requirements of 5 U.S.C. §§ 552, 553, 555(e). Economic Stabilization Act of 1970 § 207(a), *as amended,* 12 U.S.C. § 1904 note (Supp. III 1973). Section 553 specifically provides for general notice of rulemaking, an opportunity for interested persons to participate, and a waiting period of 30 days after publication before a rule becomes effective. The required notice is excused in two instances: if the rules are "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A); and if the agency "for good cause" finds the notice "impracticable, unnecessary, or contrary to the public interest," *id.* at § 553(b)(B). In addition, the waiting period is excused for substantive rules granting an exemption. *Id.* at § 553(d)(1).

■ When Phase II controls were instituted in November, 1971, the regulations promulgated concurrently, particularly sections 300.12 and 300.13,[10] were effective immediately, stating that "good cause" existed for waiving the mandates of section 553. This good cause, states CLC, was the necessity for ending the stringent freeze of Phase I controls without removing all controls during the interim period. *See* I J.A., Doc. 8, Affidavit of C. Jackson Grayson, Jr., Chairman of the Price Comm'n, at 6, ¶ 17. Despite the rather conclusory claims of "good cause," the regulations may stand if the court can take judicial notice of the emergency nature of the legislation and accompanying regulations. *See, e. g., Nader v. Sawhill,* 514 F.2d 1064, 1068 (Em.App.1975); *California v. Simon,* 504 F.2d 430, 439 (Em.App.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974), *De Rieux v. The Five Smiths,*

---

**9.** A less restrictive version of section 207 appeared in the Senate bill. It would have exempted the regulations from judicial review where the agency had found that consultation with affected persons was impracticable. S. 2891, 92d Cong., 1st Sess. (1971); *see also* U.S.Code Cong. & Admin.News, 92d Cong., 1st Sess., pp. 2289–90 (1971). This procedural leniency was rejected, however, in the final adoption of the House version of section 207 requiring compliance with certain notice and hearing provisions of the Administrative Procedure Act. *See* H.Rep. 92–714, 92d Cong., 1st Sess. 7 (1971).

**10.** These regulations, originally numbered 300.-012 and 300.013, provided in pertinent part:

§ 300.012 . . .
 A manufacturer may charge a price in excess of the base price  .  .  . to reflect

allowable cost increases in effect on or after November 14, 1971, reduced to reflect productivity gains; provided, however, that the effect of all of a manufacturer's price changes is not to increase its profit margin  .  .  . .
§ 300.013 . . .
 (a) *In general.* A person engaged in retailing or wholesaling may charge a price in excess of the base price where—(1) The customary initial percentage markup  .  .  . is equal to or less than such person's customary initial percentage markup which prevailed during the base period  .  .  . provided (2) The effect of all such person's price changes is not to increase its profit margin  .  .  . over that which prevailed during the base period.
36 Fed.Reg. 21792–93 (Nov. 13, 1971).

*Inc.*, 499 F.2d 1321, 1332 (Em.App.1974), *cert. denied sub nom. Five Smiths, Inc. v. Hollaway*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). We agree with the decision of the trial court that good cause appears for the regulations issued in November of 1971. *Tasty Baking Co. v. Cost of Living Council*, 395 F.Supp. 1367 at 1394 (E.D.Pa.1975).

█ Unlike the trial court, however, we are not convinced that "good cause" existed for the regulations promulgated in February, May, June and November of the following year. Despite the fact that the statute was amended in December of 1971, the Price Commission could have given notice immediately for additional regulations. In addition, the Commission could have offered a shorter time for comments before the effective date. *See, e. g., Consumer's Union v. Sawhill*, 393 F.Supp. 639, 641 (D.D.C. 1975), *aff'd en banc* 525 F.2d 1068 (Em. App.1975). As the court stated in *Nader v. Sawhill, supra* at 1069, "[r]epeated technical noncompliance will not be tolerated." The Commission's *pro forma* conclusion that good cause existed throughout 1972 is not justified by facts of which we may take notice; neither does the affidavit offered at trial convince us. Chairman Grayson's description of ambitious goals to reduce inflation within a brief 15-month period, I J.A., Doc. 8 at 8–9, ¶ 25, ignores the fact that Congress, also aware of the need and the time limitations, still demanded compliance with procedural requirements. Furthermore, a determination by the Commission that enforcement should be transferred from the Department of Justice, section 209 of the Act, to the Price Commission, 6 C.F.R. § 300.54, seems the kind of substantive regulation requiring public participation and notice. *See generally Shell Oil Co. v. Federal Energy Administration*, 527 F.2d 1243, at 1248 (Em.App.1975) (finding no good cause for APA noncompliance in promulgating regulations under the Emergency Petroleum Allocation Act of 1970).

The Council argues that the only relevant regulations in this case are sections 300.12 and 300.13, promulgated in November, 1971, when good cause clearly existed. Alternatively, it suggests that later regulations are "basically codification[s] of the statutory mandates" or reaffirmations of prior definition and policy. Appellee's Br. at 21–22. We do not agree with CLC that the later regulations are either irrelevant or beyond the dictates of section 553.

As found by the trial court, sections 300.5, defining profit margin, and 300.54, defining profit margin violations and providing administrative remedies for those violations, are pertinent to this case. Slip op. at 47. On February 24, 1972, amendments to section 300.5 changed the definition of profit margin from a percentage of net profits (before taxes) over gross sales, 36 Fed.Reg. 23976 (Dec. 16, 1971), to "operating income (net sales less cost of sales and less normal and generally recurring costs of business operations determined before nonoperating items, extraordinary items, and income taxes)" over net sales, 37 Fed.Reg. 3914. The preface explained that the changes were designed to be more consistent with business practices. *Id.* at 3913. It was under this amended definition that Tasty Baking Co. was found to have violated Phase II controls.

Section 300.54, promulgated May 24, 1972, defined for the first time profit margin violation and allowed the Price Commission, upon finding a violation, to issue a refund order. 37 Fed.Reg. 10494 (May 24, 1972). *Cf.* 6 C.F.R. §§ 300.-102–.013, 36 Fed.Reg. 21792–93 (1971). Without this regulation, enforcement was limited to the Department of Justice. *See* Section 207 of the Act. As Chairman Grayson noted in his affidavit, the Price Commission viewed this change in enforcement as necessary to control the large number of violations indicated by annual reports submitted in March of 1972. I J.A., Doc. 8 at 10, ¶ 29. The substantive changes effected by the regulation two months later provide the basis for the orders at issue here and require a declaration that these regulations

are invalid. *Shell Oil Co. v. Federal Energy Administration, supra,* at 1248.

We note that our holding as to the orders and decisions pending before us does not necessarily foreclose a finding of violation in an action brought by the Department of Justice. Because the trial court did not specifically find that other regulations challenged by Tasty Baking Co.[11] are relevant here, we make no ruling as to the validity of those regulations. If such an enforcement action is brought, the trial court may examine the challenged regulations in light of our guidance regarding "good cause" and any other exceptions to section 553 which may be applicable.

 For the foregoing reasons we affirm the trial court's decision upholding CLC orders which deny further exception relief, but we declare the violation order of August 2, 1973 invalid in that it relies on regulations promulgated in violation of 5 U.S.C. § 553. The judgment of the district court is thus affirmed in part and reversed in part.

Judge Hastie concurs in result. He also joins in all of the opinion of the court except so much of it as invalidates § 300.54 of the regulations. He considers that question a doubtful one that need not be resolved in this case.

*So ordered.*

---

11. Tasty Baking Co. also challenges sections 300.59 (allowing the Commission to require separate reports), 300.203 (restatement to reflect spin-off or split-off but not acquisition or divestiture), and 300.351, –.353, –.355(a), –.371(a) and –.373(a) (criteria for obtaining an exception). Appellant's Br. at 22. The parties have stipulated that these regulations are substantive and not just policy or interpretation. I J.A., Doc. 5 at 7, ¶ 25.