**SHELL OIL COMPANY, Plaintiff,**

v.

**FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Defendants,**

**and**

**United States of America, Counterclaimant.**

**Civ. A. No. 76–52.**

United States District Court, D. Delaware.

Sept. 8, 1977.

Richard J. Abrams, of Richards, Layton & Finger, Wilmington, Del. (William Simon, William L. Wickens, and Frederick S. Frei, of Howrey & Simon, Washington, D.C., of counsel), for plaintiff.

Kent Walker, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., Marvin L. Coan, Dept. of Justice, Washington, D.C., for defendants and counterclaimant.

MURRAY M. SCHWARTZ, District Judge.

Shell Oil Company ("Shell") has brought this action seeking review of a Decision and Order of the Federal Energy Administration ("FEA"), dated January 6, 1976. It challenges on several grounds the determination by the FEA that Shell violated 10 C.F.R. § 212.112 of the regulations of the FEA as effective July 10, 1974, and seeks to enjoin the enforcement of the Order. The regulations, the validity and application of which Shell contests, concern the price ceiling regulation for unleaded gasoline. Defendant, the FEA, is an agency of the United States, established under the Federal Energy Administration Act of 1974 ("Energy Act"),[1] and by Executive Order No. 11790[2] to, among other things, allocate petroleum products and regulate their prices. It is the successor to the Federal Energy Office ("FEO"). Defendant O'Leary is the Administrator of the FEA.[3]

Presently before the Court are cross-motions for summary judgment. Before addressing the legal issues raised by these motions, a brief review of the factual background of this case is necessary.

### I. Background

In January, 1973, the Environmental Protection Agency ("EPA") published regulations which required that unleaded gasoline be made available by July 1, 1974 to all retail gasoline outlets selling more than 200,000 gallons per year.[4] During the spring of 1974, sellers began to place unleaded gasoline on the market. Concerned that the absence of any price regulation for unleaded gasoline might lead to "unrepresentative or inappropriate" pricing, the FEO decided to promulgate an appropriate regulation[5] under the powers delegated to it by the Cost of Living Council[6] and by the President.[7]

---

1. 15 U.S.C.A. §§ 761 et seq.

2. 3A C.F.R. 157 (1974).

3. When the complaint was filed in February, 1976, Frank G. Zarb was the Administrator of the FEA, and the caption so indicates. Mr. Zarb has since resigned and Mr. O'Leary has been substituted by order of this Court dated June 24, 1977. Doc. 22.

4. 40 C.F.R. 80.22(b).

5. 39 Fed.Reg. 18638 (May 29, 1974).

6. The Cost of Living Council received its authority by delegation from the President under the Economic Stabilization Act of 1970. 12 U.S.C.A. § 1904.

7. The President was granted his authority under the Emergency Petroleum Allocation Act of 1973. 15 U.S.C.A. § 751 et seq.

Pursuant to regulations issued in January, 1974, the FEO had previously established petroleum prices,[8] but had not set prices for unleaded gasoline sold by refiners who were not marketing unleaded gasoline as of May 15, 1973. Thereafter, on May 29, 1974, the FEO issued an amendment to its Mandatory Petroleum Price Regulations providing for an interim price regulation to be in effect during the month of June 1974 (the "June interim rule") and also invited comments "in the rulemaking proceeding as to what the final price rule for unleaded gasoline should be."[9] The FEO emphasized that although the interim rule was to be fully effective on June 1, the FEO might adjust it "at the conclusion of the related rule-making proceeding." The June interim rule provided that unleaded gasoline sold by refiners who did not sell unleaded gasoline as of May 15, 1973, not be priced "in excess of the weighted average price at which premium grade gasoline was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973."[10]

On June 10, 1974, Shell submitted comments to the effect that the May 29, 1974, regulation was generally "acceptable to Shell as written" although it permitted some refiners to price their product at a level "well above competitive prices."[11] Later in the month of June, Shell allegedly learned that a proposed price for unleaded gasolines based on a comparative cost analysis of the new unleaded gasolines against existing prices for regular gasoline was under consideration. Shell submitted comments dated June 25, 1974 stating its objection to this change in the May 29 proposal.

On June 27, 1974, the President established the Federal Energy Administration (FEA) pursuant to the enabling provision of the Energy Act.[12] The FEA succeeded the FEO as the agency primarily responsible for regulation of the prices and allocation of petroleum products. Notwithstanding the FEA's late appearance in the process of fixing the price of unleaded gasoline, plaintiff and defendants do not dispute that the rule-making procedures made applicable to the FEA under the Energy Act of June 27, 1974 govern the subject matter of this law suit.

On July 1, 1974, the FEA issued a revised unleaded gasoline price regulation. Despite the fact that the regulation was not published until July 8, its provisions were made retroactive to July 1.[13] Then on July 10, 1974, the FEA changed the effective date for the revised price regulation to July 10, 1974, so as to "avoid the need for disruptive retroactive adjustments in prices for unleaded gasoline . . . and the problem that would otherwise be involved with respect to enforcing retroactive price adjustments."[14] Section 211.112(b)(1) of the new regulation provided in pertinent part:

For purposes of determining under section 211.82(b), the weighted average price at which unleaded gasoline was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, a refiner shall use a price not in excess of the weighted average price at which leaded gasoline of the same or nearest octane number was lawfully priced by it in

8. 10 C.F.R. 212. Mandatory Petroleum Allocation and Price Regulations.

9. 39 Fed.Reg. 18638 (May 29, 1974).

10. *Id.* Proper notice and cpportunity to comment on the June interim regulation was not afforded by the FEO. Consequently, the June interim regulation was declared invalid for failure to comply with the rule-making procedures of the Administrative Procedure Act then applicable to the FEO. *Consumer's Union v. Sawhill*, 393 F.Supp. 639 (D.D.C.1975), *aff'd per curiam* 523 F.2d 1404 (Em.App.1975).

11. Doc. 1 at Exhibit B.

12. Exec.Order No. 11,790, 3A C.F.R. 157 (1974).

13. 39 Fed.Reg. 24924 (July 8, 1974).

14. 39 Fed.Reg. 25359 (July 10, 1974). This July 1-July 10 regulation will be referred to as the "July 10 interim price regulation" or the "July 10 rule."

transactions with that class of purchaser on May 15, 1973, plus 1 cent; . . .[15]

On or about September 25, 1974, a "Notice of Probable Violation" dated September 14, 1974, was served on Shell by the FEA which stated that the FEA had reviewed Shell's records of its pricing of unleaded gasoline and had reason to believe that Shell had violated Section 212.112 during the period from July 10, 1974 through July 31, 1974. Shell filed a reply to the FEA's notice on October 16, 1974, seeking both withdrawal of the Notice and a ruling that Shell's prices for its unleaded gasolines were proper.

The FEA served a "Remedial Order" upon Shell on July 8, 1975, ordering Shell to immediately reduce its prices charged for unleaded gasoline, and to make restitution to customers that purchased unleaded gasoline between July 10, 1974, and July 8, 1975. The Remedial Order ordered restitution of overcharges during the entire nine-month period which elapsed before the issuance of an appealable order.

Shell appealed from the Remedial Order to the Office of Exceptions and Appeals of the FEA on July 18, 1975. In a decision and order dated January 6, 1976,[16] Shell's appeal was denied, but the case was remanded in part to the Regional Administrator of FEA Region VI, solely to fashion more appropriate restitutionary relief. The Decision and Order stated that it was otherwise a final order of the FEA from which Shell could seek judicial review.[17]

Shell filed the instant complaint on February 4, 1976. Having exhausted its administrative remedies with respect to its alleged violation of section 212.112 of the FEA's regulations, Shell urges it has no adequate remedy except that which it seeks in this action.

On the instant cross-motions for summary judgment, the only issue which need be treated is whether Section 212.112(b)(1) of the FEA's regulations is null and void for failure to comply with the procedures required by the Energy Act,[18] and the Administrative Procedure Act as incorporated in the Energy Act.[19]

## II. Applicability of the APA

This matter was briefed and argued on the premise that various provisions of both the APA and Energy Act are applicable to the rule-making powers of the FEA. Shell claims five distinct procedural violations: (1) that there was inadequate and thus improper notice of rule-making under the APA, 5 U.S.C.A. § 553(b)[20] insofar as the notice failed to provide a "description of subjects and issues involved," (2) that under the APA, 5 U.S.C.A. § 553(c)[21] Shell was wrongfully deprived of an opportunity to comment on the merits of the comparative octane pricing formula adopted in the July 10 rule, (3) that the FEA published the July 10 interim rule in violation of the APA, 5

---

**15.** 10 C.F.R. 212.112(b)(1).

**16.** As supplemented February 13, 1976.

**17.** On April 11, 1977 the Regional Administrator for Region VI issued a Revised Remedial Order on the remedial question. For purposes of determining the pivotal issues before the Court, the January 6 order controls.

**18.** 15 U.S.C.A. § 766(i)(1)(B), (C).

**19.** 15 U.S.C.A. § 766(i)(1)(A), 5 U.S.C.A. § 553.

**20.** 5 U.S.C.A. § 553(b) provides:
"General notice of proposed, rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

*    *    *    *    *    *

(3) either the terms or substance of the proposed rule or a description of subjects and issues involved."

**21.** The relevant provision of the APA requires that

"After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. . . ." 5 U.S.C.A. § 553(c).

U.S.C.A. § 553(d) [22] which requires publication of a substantive rule 30 days in advance of its effective date unless the administrative agency has good cause to dispense with the requirement, (4) that the FEA denied plaintiff the right to notice and comment on the comparative octane pricing formula in violation of the Energy Act, 15 U.S.C.A. § 766(i)(1)(B),[23] (5) that the FEA wrongfully deprived Shell of "an opportunity for oral presentation of views, data, and arguments" directed toward the comparative octane pricing formula in violation of the Energy Act, 15 U.S.C.A. § 766(i)(1)(C).[24]

Before addressing any of the above issues, a threshold matter must be considered: whether both provisions of the APA and the provisions of the Energy Act were applicable to the rule-making procedure which resulted in the July 10 price regulation or whether only the Energy Act applied. Stated a bit differently, the issue is whether the notice, comment and publication provisions of the Energy Act complement or supersede the same provisions of the APA.

This problem arises because 15 U.S.C.A. § 766(i)(1)(A) provides in pertinent part that:

"Subject to paragraphs (B), (C), and (D) of this subsection, the provisions of subchapter II of chapter 5 of Title 5 [includes *inter alia* section 553 of Title 5, the notice, comment and deferred effective date provisions of the APA] shall apply to any rule or regulation . . . ."

Although it is possible to read the notice and comment provisions of the Energy Act as complementing rather than supplanting analogous provisions of the APA,[25] Section

---

**22.** 5 U.S.C.A. § 553(d) requires that:
"The required publication of a substantive rule shall be made not less than 30 days before its effective date, except—

.    .    .    .    .

"(3) as otherwise provided by the agency for good cause found and published with the rule."

**23.** 15 U.S.C.A. § 766(i)(1)(B) provides in pertinent part, that:
"Notice of any proposed rule, regulation, or order described in paragraph (A) shall be given by publication of such proposed rule, regulation, or order in the Federal Register. In each case, a minimum of ten days following such publication shall be provided for opportunity to comment; . . . ."

**24.** 15 U.S.C.A. § 766(i)(1)(C) provides:
In addition to the requirements of paragraph (B), if any rule, regulation, or order described in paragraph (A) is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses, an opportunity for oral presentation of views, data, and arguments shall be afforded. To the maximum extent practicable, such opportunity shall be afforded prior to the issuance of such rule, regulation, or order, but in all cases such opportunity shall be afforded no later than forty-five days after the issuance of any such rule, regulation, or order. A transcript shall be kept of any oral presentation.

**25.** As such, the administrative scenario for adoption of an unleaded pricing regulation would consist of several steps. First, the FEA would have to give notice of proposed rulemaking in the Federal Register. Under the APA, the notice may consist of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C.A. § 553(b)(3). In contrast, the Energy Act specifically requires publication of the proposed rule. 15 U.S.C.A. § 766(i)(1)(B). By reading the two acts together, the FEA may initiate rule-making by publishing a description of the issues involved, receiving comments and then publishing the proposed regulations in the Federal Register. What the FEA may not do under this scenario is move immediately from the description of the issues involved to promulgation of the rule, as it may if only the APA applies, because the Energy Act requires that the proposed regulation be published prior to issuance of a final rule. 15 U.S.C.A. § 766(i)(1)(B). Both the APA and the Energy Act provide for waiver of the notice requirement, but the basis for the agency dispensing with notice is different under each Act. The APA would require a finding "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C.A. § 553(b)(3)(B). The Energy Act permits waiver of notice "where strict compliance is found to cause serious harm or injury to the public health, safety or welfare, . . ." 15 U.S.C.A. § 766(i)(1)(B). Presumably, if one reads the two acts as complementary, notice cannot be waived unless the requirements of both statutes are met.

Each of the two acts provides for opportunity to comment in response to the notice of rulemaking. The Energy Act specifies 10 days as the minimum time for comment, whereas the APA is silent as to the time period for comment. Further, since the Energy Act appears

7(i)(1)(A) of the Energy Act (15 U.S.C.A. § 766(i)(1)(A)) does not provide a conclusive answer, and thus, attention must be turned to the legislative history to determine Congress' intent.

The Senate version of the Energy Act expressly provided for the APA and specifically 5 U.S.C.A. § 553 to regulate FEA's rule-making authority.[26] The House of Representatives amended its version of the bill to add the provisions which eventually became 15 U.S.C.A. § 766(i)(1). The author of the amendment, Representative Broyhill, explained as follows the rationale behind the proposed changes:

"Legislation which in the past has attempted to meet emergency or crisis situations has failed to provide for suitable Administrative Procedural provisions. The goal of procedures in this type of

legislation should be to provide orderly process for affected individuals and corporations while at the same time providing the greatest degree of safeguards to those individuals and corporations affected by the actions of the agency consistent with the necessity for prompt agency action.

"Actions taken by the Administrator in carrying out the functions under this bill will have a deep and far-reaching effect. The amendment provides that a publication to the Federal Register will give at least 10 days notice of a proposed rule, regulation or order and shall provide an opportunity for comment. In the past agencies such as the Cost of Living Council have acted without having the benefit of those who will be most affected by an action. Often the prior views of those

---

to contemplate publication of any proposed rule, successive 10-day comment periods might ensue if, in response to comments on an earlier proposed rule or of its volition, the FEA modifies the earlier rule substantially. 15 U.S.C.A. § 766(i)(1)(B). By contrast, the APA would permit a substantial change in the proposed regulation without the necessity of republication. Cf. *South Terminal Corp. v. Environmental Protection Agency*, 504 F.2d 646, 659 (1st Cir. 1974); *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 632 (1973). Indeed, as noted above, the APA would allow promulgation of a final rule without even publishing the proposed rule; it would require only publication of the issues involved in the rule. 5 U.S.C.A. § 553(b)(3). The requirement of comments can be waived for the same reasons discussed in connection with the notice provisions.

Finally, the APA would require the FEA to publish the final rule no less than 30 days prior to its effective date. 5 U.S.C.A. § 553(d). The Energy Act does not establish a comparable requirement, but does dictate that the FEA provide an opportunity for oral presentation of views, if the regulation "is likely to have a substantial impact on the nation's economy or large numbers of individuals or businesses." 15 U.S.C.A. § 766(i)(1)(C). The statute expresses Congress' desire that this occur prior to issuance of the regulation, but in any event it may occur no later than 45 days after issuance. 15 U.S.C.A. § 766(i)(1)(C). If both acts are to be met, it is arguable that an agency must provide both a 30-day notice period prior to adoption as well as 45 days for oral commentary.

The complicated procedural obstacle course described above contrasts sharply with the

stream-lined process available if one concludes that only the notice, comment and publication provisions of the Energy Act apply to FEA rule-making. Under that Act, the FEA must publish the proposed regulation in the Federal Register and provide a minimum of 10 days for public comment unless the circumstances satisfy one or more of the statutory conditions for dispensing with public comments. Finally, if the regulation is likely to have a substantial impact on the nation's economy or large numbers of individuals or businesses are likely to be affected, the FEA must provide an opportunity for oral presentation of "views, data, and arguments" no later than 45 days after issuance of the regulation. 15 U.S.C.A. § 766(i)(1)(C).

26. S 2776 provided in relevant part:

"ADMINISTRATIVE PROCEDURE IN ORDER TO INSURE ACCOUNTABILITY AND DUE PROCESS

"SEC. 121. (a) The functions transferred to the Administrator pursuant to section 105(a)(1) and section 105(b) of this title and exercised by him pursuant to this title are excluded from the operation of subchapter 2 of chapter 5, and chapter 7 of title V, United States Code, except as to the requirements of sections 552, 555(c) and (e), and 702 and except as to the requirements of section 553 as modified by subsection (b) of this section.

"(b) All rules, regulations, or orders promulgated pursuant to the exercise of such functions shall be subject to the provisions of section 553 and title V of the United States Code . . . ." 119 Cong.Rec.S 2776 (Dec. 19, 1973).

knowledgeable in the field being regulated could have prevented an ill-conceived plan or rule from going into effect—a plan or rule which often had to be subsequently altered. The functions of the agency can best be carred [sic] out by an Administrator who issues rules, regulations, or orders which emanate from the greatest possible data base. The provision in this amendment allowing a period of comment prior to implementation goes a long way toward achieving that goal.

"Instances may occur where to achieve the purposes of the act immediate action is required on the part of the Administrator. The amendment provides that the provisions for notice and opportunity to comment may be waived where strict compliance is found to cause serious impairment to the operation of the program. In order to insure that this provision for waiver is not abused by the Administrator, his findings requiring the necessity of the waiver must be set out in the rule, regulation, or order.

"The Administrator will likely promulgate rules, regulations, or orders which will have a substantial impact on the Nation's economy or on large numbers of individuals or business [sic]. Under the procedures of the Economic Stabilization Act such important actions have been taken with little or no opportunity for presentation of views. Promulgations of such monumental import should at the least be accomplished after affected parties are afforded the basic right to orally present their views. This will result in better actions by the agency and allow individuals and corporations an opportunity for a face-to-face hearing and to suggest modifications where they have reason to believe that a proposal will unduly burden them. Such modification may bring about an equally effective result without causing a severe hardship to any one party or group. Where possible the amendment provides for oral comment prior to implementation but in no event later than 45 days after implementation." 120 Cong.Rec.H. 1514–15 (March 6, 1974).

Subsequently, Representative Holifield, who introduced the original bill, offered his interpretation of the amendment:

[The Broyhill amendment] offers certain emergency procedures which would speed up the hearing procedures that are now in existence under the Administrative Procedure Act." 120 Cong.Rec.H. 1543 (March 7, 1974).

The Broyhill amendment was adopted by the House of Representatives. Because of differences between the House and Senate versions of the energy bill, a conference committee was convened. The House and Senate reports that emerged from the conference explained the committee's reasons for adopting the House administrative provisions:

"The conference substitute in section 7(i)(1) and (3) adopts substantially the House provisions as being somewhat more detailed and complete. The subsection applies, with modifications, Administrative Procedure Act provisions not only to rules and regulations, but also to orders similar to a rule or regulation. This reflects the conferees' intent that the Administrator should provide notice and opportunity for comment whenever his proposed action could have an impact on more than the few persons who, in the absence of such public notice, would be likely anyway to receive personal notice of the proper action. It is expected that the exception to the notice provision in paragraph (B) of section 7(i) of the conference substitute will be used sparingly. . . . The conferees intend that if the Administrator is in doubt about the applicability of any of the standards provided in this section, he will resolve the doubt in favor of the fullest application of procedural safeguards." 120 Cong.Rec.H. 3088 (April 23, 1974).

The legislative history outlined above provides solid evidence of the concerns Congress had in mind when enacting the Energy Act, but does not establish conclusively whether Congress also intended the notice, comment, and publication provisions of the APA to apply to FEA rule-making. Clear-

ly, Congress wanted the FEA to have as much input as possible from affected individuals and corporations as well as the general public. Pursuant to that policy, the Energy Act provides both a 10-day comment period and, in certain cases, an opportunity to make oral presentations. Since the APA provides a means of ascertaining public opinion prior to publication of the proposed regulation and a 30-day notice period prior to the effective date of the final regulation, one might conclude that the APA does apply and that the Energy Act provisions for comment and notice are simply additional safeguards to protect against hasty and uninformed agency action. Militating against that conclusion, however, is the simple fact that the conference committee rejected the language of the Senate bill which unequivocally adopted the APA, 5 U.S.C.A. § 553 in favor of the Broyhill amendment which according to Representative Broyhill permits hearings on an expedited basis not available under the APA.

█ The case at bar does not require this Court to decide whether the notice, comment, and publication provisions of the APA apply to the FEA rule-making process, because whether or not the APA also applies to the rules promulgated by the FEA, it is clear that the relevant provisions of the Energy Act must be satisfied. This Court has concluded that in the formulation of the July 10 unleaded gasoline regulation, the FEA did not comply with the Energy Act. Accordingly, it is unnecessary and unwise to decide at this time whatever additional impact the APA exerts on the activities of the FEA.

### III. Violation

The Energy Act contains three requirements concerning publication and comment: (1) The FEA must publish the proposed rule, regulation or order in the Federal Register;[27] (2) The FEA must provide an opportunity to comment for a minimum of 10 days following publication unless waived by a statutorily specified finding;[28] and (3) If the rule, regulation or order is likely to have a substantial impact either on the nation's economy or on a large number of individuals or businesses, the FEA must afford an opportunity for oral presentation of "views, data and argument."[29] The FEA complied at best only with the first of these requirements.

### A. Notice of the Proposed Regulation

There is no dispute that a revised interim price rule for unleaded gasoline was issued on July 1, 1974[30] with a July 1 effective date. It is equally settled that the regulation was not published in the Federal Register until July 8.[31] In the Federal Register of July 10, 1974, the FEA changed the effective date to July 10, 1974.[32] Without deciding whether this procedure complied with the notice requirement of the Energy Act, it will be assumed arguendo that the publication was satisfactory.

### B. Opportunity to Comment—10-Day Period

█ At one point prior to commencement of this litigation the FEA conceded it failed to provide an opportunity to comment as required by 15 U.S.C.A. § 766(i)(1)(B):

"Prior to revising the May 29 interim price rule for unleaded gasoline, the FEA could have provided an opportunity for comment as required by Section 7(i)(1)(B). However, the finding that the FEA did not strictly conform to the provisions of Section 7(i)(1)(B) of the [Energy Act] in promulgating the revised interim unleaded gasoline rule does not automatically lead to [the] conclusion that the rule itself is invalid from the date of issuance." Doc. No. 1—Complaint, Ex-

---

**27.** 15 U.S.C.A. § 766(i)(1)(B).

**28.** Id.

**29.** 15 U.S.C.A. § 766(i)(1)(C).

**30.** The term "issued" is used in the same sense as that employed by the FEA in the Federal Register, 39 Fed.Reg. 25359 (July 10, 1974).

**31.** Id.

**32.** 39 Fed.Reg. 25359 (July 10, 1974).

hibit H—Jan. 6, 1976 Remedial Order, p. 6.

Notwithstanding its pre-litigation written concession, the FEA now argues that it complied with the 10-day comment period required by the Energy Act. Its theory is that the publication of the June interim rule and the invitation contained in that notice to comment on a final pricing rule satisfied the provisions of 15 U.S.C.A. § 766(i)(1)(B). This contention fails for two reasons. First, the June interim regulation which keyed unleaded gas prices to premium gas prices was a temporary measure effective only during the month of June. Publication of it in neither form nor substance can be considered publication of the proposed July 10 regulation which based unleaded gas prices on a comparison of regular octanes.[33] Second, the FEA's invitation of comments "as to what the final price rule for unleaded gasoline should be"[34] assumed that no proposed rule had been formulated and that the FEA was soliciting comments on what the rule should be. Hence, the June interim rule cannot fairly be construed as publication of a "proposed rule" for purposes of 15 U.S.C.A. § 766(i)(1)(B).[35]

■ It has been suggested that even if the FEA did not comply with the 10-day notice provision, the unleaded gasoline price regulation is still valid because the agency could waive the comment period. The argument is based on the contention that since EPA regulations[36] required the availability of unleaded gasoline by July 1, 1974, and a delay in the effective date would have left the price of this gasoline uncontrolled, these circumstances meet the emergency conditions justifying waiver of the comment period.

Defendants' position is premised on a line of petroleum price control cases which arose prior to enactment of the Energy Act of June 27, 1974 and which under the APA have sustained a finding of "good cause" for failure to provide either comment or a 30 day deferred effective date following publication of a price control rule. *Tasty Baking Co. v. Cost of Living Council,* 529 F.2d 1005 (Em.App.1975); *Texaco, Inc. v. Federal Energy Administration,* 531 F.2d 1071 (Em.App.), *cert. denied* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Nader v. Sawhill,* 514 F.2d 1064 (Em.App.1975); *California v. Simon,* 504 F.2d 430 (Em. App.), *cert. denied* 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974). However, the Temporary Emergency Court of Appeals ("TECA") has not always condoned the failure of an Administrative Agency to abide by the notice requirements of the APA. *Tasty Baking Co. v. Cost of Living Council, supra; Shell Oil Co. v. Federal Energy Agency,* 527 F.2d 1243 (Em.App.1975); *Consumer's Union v. Sawhill,* 393 F.Supp. 639 (D.D.C.1975), *aff'd per curiam* 523 F.2d 1404 (Em.App.1975).

Dicta initially articulated in *Nader v. Sawhill, supra,* is particularly instructive. In *Nader* the TECA held for the FEO, predecessor to defendant, but warned the defendants:

". . . that repeated technical noncompliance will not be tolerated. Moreover, we stress categorically that our resolution of the procedural issues herein is founded upon the unique circumstances in which *this* price increase was formulated. Assuming less calamitous circumstances, we fully expect that any future decisions will take the utmost advantage of full and open public comment." (emphasis in original) *Nader v. Sawhill, supra,* 514 F.2d at 1069.

**33.** 39 Fed.Reg. 24923 (May 29, 1974).

**34.** 39 Fed.Reg. 18638 (May 29, 1974).

**35.** Although the July 10th rule originally published on July 8, 1974 permitted comment until July 22, 1974, it is invalid because it was a "final" rule rather than a "proposed" rule and there was no express finding under 15 U.S.C.A. § 766(i)(1)(B) upon which to predicate a waiver

of the 10-day comment period required for all "proposed" rules. It is probably because of this deficiency that the FEA did not seriously urge it had abided by its statutory obligation to afford opportunity for comment under 15 U.S. C.A. § 766(i)(1)(B).

**36.** 40 C.F.R. § 80.22(b).

The warning of *Nader* became the holding in *Consumer's Union v. Sawhill, supra.* In that case the TECA by per curiam opinion affirmed the district court's invalidation of the June interim price regulation for unleaded gasoline [37] because it was imposed without the advance public notice and opportunity to comment required by the APA.

Defendant's argument in support of waiver is understandably predicated upon its own workload but is nonetheless unacceptable. Even though the FEA can be fairly characterized as harassed by emergency conditions precipitated by the oil embargo, it nonetheless knew of the necessity for a price regulation for unleaded gasoline 16 months prior to July 1, 1974. Furthermore, Congress, with knowledge of the FEA's problems, saw fit to require the FEA to provide an opportunity for comment under the Energy Act, the provisions of which were known to the FEA as of May 7, 1974.[38] Finally, the factual record undercuts the argument of "waiver" since the FEA did not adopt and publish a subsequent regulation with an effective date of July 1.

### C. Opportunity for Oral Presentation— 45-Day Requirement Under the Energy Act

In its brief, the FEA states that "[d]efendants do not dispute the fact that no opportunity for oral comment was provided in connection with the revised interim price rule for unleaded gasoline." [39] Furthermore, the FEA admits that "[it] could have and perhaps should have complied with § 7(i)(1)(C) by providing an opportunity for oral comment after issuance of the revised interim price rule." [40]

■ The FEA attempts to excuse itself by arguing that the regulation falls within an exception to the statutory requirement in that it was not likely at the time the rule was adopted that it would have a "substantial" impact on the economy or on large number of individuals. In view of the magnitude of the sales of unleaded gasoline under this rule,[41] and the FEA's own reliance on the emergency nature of the regulations in question, I find the position of the FEA so untenable as to border upon the frivolous. Accordingly, it is held that the FEA should reasonably have believed that the price regulation for unleaded gasoline was likely to have a substantial impact [42] on the nation's economy and a large number of individuals and businesses.

■ The FEA contends, finally, that regardless of whether the Court concludes that "substantial impact" existed, no violation of section 7(i)(1)(C) (15 U.S.C.A. § 766(i)(1)(C)) exists because Shell was in no way prejudiced as a result of not having an opportunity for oral comment. The short answer to this contention is that the legislative history evidences strong congressional concern that the FEA provide extensive opportunity for comment from industry and the public without compromising the agency's capacity to function under emergency conditions.

■ It is concluded the FEA violated 15 U.S.C.A. § 766(i)(1)(B) in that it failed to afford a minimum 10-day opportunity to comment on a proposed rule without making the requisite specific findings which would have waived the comment period. Further, the FEA also violated 15 U.S.C.A. § 766(i)(1)(C) because it failed to permit oral presentation of views, ideas and arguments addressed to the July 10 rule within 45 days.

### IV. Remedy

It has been suggested that if the Court found a violation, an appropriate remedy would be to defer the effective date of the

---

**37.** See *supra*, p. 879, n.10.

**38.** 15 U.S.C.A. § 766.

**39.** Doc. 16 at 35.

**40.** *Id.* at 36.

**41.** The EPA had estimated that 60 to 85 per cent of all 1975 automobiles would require unleaded gasoline. 39 Fed.Reg. at 18665.

**42.** The FEA argues that compliance with section 7(i)(1)(C) was excused due to the "apparent temporariness" of the regulation. The statute, however, provides no exception for hastily enacted rules of potential short life.

July 10, 1974 rule for 45 days from that date. This position is predicated upon an analogy to some cases under the APA, 5 U.S.C.A. § 553(d), which requires publication of a substantive rule in the Federal Register 30 days prior to its effective date. A violation of this section may be remedied by declaring the rule invalid until 30 days after publication but valid thereafter. *See* *e. g., Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972). In counterpoint stands another long line of cases which firmly establishes that a regulation promulgated in violation of the procedural requirements of the APA is void. *City of New York v. Diamond,* 379 F.Supp. 503, 516 (S.D. N.Y.1974) (citing cases).

However, it is unnecessary to choose between these divergent lines of authority because an analogy to the APA is unavailing. The purpose of a deferred effective date under the APA is to afford those affected a period of preparation prior to the effective date of the rule. In contrast, the legislative history of the Energy Act makes clear that the purpose of the 45-day oral presentation provision is to alert the FEA to the views of industry and the public. Since the 45-day period is required "in addition to the" 10-day comment period,[43] it is an integral part of the rule-making process. Where, as here, Congress has determined that free enterprise predicated upon the natural economic forces of supply and demand should be suspended by direct price control, the agency must adhere strictly to safeguards Congress has established to avoid ill-informed and imprudent administrative action. Accordingly, it is concluded that the FEA regulation establishing a price rule for certain unleaded gasoline effective July 10, 1974 is void.[44] An order will be entered granting Shell's motion for summary judgment and denying the cross-motion of defendants.

---

**43.** 15 U.S.C.A. § 766(i)(1)(C).

**44.** It is therefore unnecessary to treat the claim of the FEA that Shell should make restitution.