**ATLANTIC RICHFIELD COMPANY, Plaintiff,**

v.

**FEDERAL ENERGY ADMINISTRATION et al., Defendants.**

**No. C–76–591 RFP.**

United States District Court, N. D. California.

July 19, 1976.

F. Bruce Dodge, Dominic J. Campisi, Morrison & Foerster, San Francisco, Cal., for plaintiff Atlantic Richfield Co.

John D. O'Connor, Asst. U.S. Atty., San Francisco, Cal., for defendant Federal Energy Administration.

## OPINION AND ORDER

PECKHAM, Chief Judge.

This action concerns the validity of two determinations by the Federal Energy Administration (hereafter "FEA") that certain Atlantic Richfield Company (hereafter "ARCO") Commission Distributors and Commission Tank Truck Distributors are "wholesale purchaser-resellers" within the meaning of 10 C.F.R. 211.51. Plaintiff ARCO seeks a preliminary injunction that would set aside these determinations. It claims that they are invalid because (1) they were made without affording ARCO the necessary protections of due process to which it was entitled under the Constitution; (2) they are not supported by substantial evidence; and (3) they are in excess of the FEA's statutory authority. Defendant FEA vigorously contests these assertions and has moved to dismiss plaintiff's complaint or in the alternative for summary judgment. Before reaching the merits of these arguments, it will be necessary to briefly review the statutory and factual background from which this case has arisen.

## I

### A. STATUTORY BACKGROUND

The Emergency Petroleum Allocation Act of 1973, P.L. 93–159, 15 U.S.C. § 751 *et seq.* (hereafter "EPAA") was enacted by Congress and approved by the President on November 27, 1973. It has since been extended by the enactment of the Energy Policy and Conservation Act, P.L. 94–163. The Findings and Purpose set forth in section 2 of the EPAA indicate that Congress was acting to mitigate the so-called "energy crisis," which then threatened the nation. Accordingly, the legislation directed the President to promulgate regulations within 15 days of the legislation's enactment in order to provide for the mandatory allocation of crude oil, residual fuel oil, and re-

fined petroleum products in amounts and at prices specified in these regulations.[1] On December 4, 1973, the President issued Executive Order 11748, which established the Federal Energy Office (hereafter "FEO") and delegated to it all the authority vested in the President by the Allocation Act. The FEA is the successor to the FEO and, acting in accordance with the President's delegation of authority, has issued Revised Petroleum Allocation and Price Regulations, 39 C.F.R. § 202 *et seq.*

Because the FEA was attempting to design a pervasive mandatory allocation and price control program that would apply to all portions of the petroleum producing industry, the FEA had to develop definitions and regulations applying to a variety of supplier-purchaser relationships. One such relationship, at issue here, as well as the companion case of *Spinetti et al. v. ARCO et al.,* C–75–0324 RFP [2] is that of "wholesale purchaser-reseller." It is defined as

> any firm which purchases, receives through transfer, or otherwise obtains (as by consignment) an allocated product and resells or otherwise transfers it to other purchasers without substantially changing its form.

10 C.F.R. 211.51.

Pursuant to regulation 10 C.F.R. 211.9, suppliers are required to continue supplying petroleum products to the wholesale purchaser-resellers to whom the products were sold to during the base period specified in the regulations.[3] Thus, exactly what firms and persons are said to be "wholesale purchaser-resellers" becomes very critical. As a result, the FEA has issued various rulings which attempt to elaborate upon the term's definition.

---

1. Section 4(b)(1) of the EPAA sets forth nine general objectives which the regulations were to achieve to the maximum extent practicable:

> (A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;
> (B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);
> (C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;
> (D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;
> (E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;
> (F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded in-

dependent marketers, branded independent marketers, and among all users;
> (G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;
> (H) economic efficiency; and
> (I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

2. *Spinetti* involves the question of whether ARCO's attempts to close the bulk plants of plaintiffs Spinetti, Hughes, Zandell, and Wallace, ARCO Commission Distributors and Commission Tank Truck Distributors, are unlawful. A critical issue in that case is whether those plaintiffs are "wholesale purchaser-resellers." In arguing that they are "wholesale purchaser-resellers," the *Spinetti* plaintiffs *inter alia* rely on the FEA determinations being challenged here. Accordingly, at the oral argument of these motions, Spinetti, Hughes, Zandell and Wallace were allowed to intervene in this case as party defendants.

3. 10 C.F.R. 211.9 provides in relevant part:
"(2)(i) Unless otherwise provided in this part or directed by the FEA, the supplier/wholesale purchaser-reseller relationships defined by specific dates or base periods or otherwise imposed pursuant to this part shall be maintained for the duration of the Mandatory Petroleum Allocation Program and may not be waived or otherwise terminated without express written approval of FEA."

These rulings indicate *inter alia* that firms which obtain an allocated product on consignment and then resell or otherwise transfer the product are not automatically excluded from the definition solely because they fail to take legal title to the product. Rather, the test employed is whether consignees have a "substantial degree of operational independence in the conduct of their business of transfer and sale of a supplier's product" as opposed to "merely providing a distribution service between a supplier and the supplier's customers or functioning like an employee of the supplier." Thus, in situations where a firm receives products through consignment and is engaged in marketing that product to the consignee's customers, acting generally like a jobber, the firm will qualify as a wholesale purchaser-reseller. *See e. g.,* FEA Ruling 1975–8, 2 FEA ¶ 16048 (1975).

In addition to these general rulings of broad application, the FEA also issues letters of interpretation, which provide a means for obtaining a ruling on the status of a particular economic relationship. See 10 C.F.R. 205.80. An administrative appeal from such an interpretation may be taken by any person aggrieved by that interpretation. 10 C.F.R. 205.100. An order sustaining or overturning such an interpretation is a final FEA order of which the appellant may seek judicial review. 10 C.F.R. 205.-106(b); 15 U.S.C. § 754(a)(1).

 Here, ARCO seeks judicial review of two FEA orders denying ARCO's appeals of interpretations which declared Stanton W. Boyett, an ARCO Commission Distributor, and Gordon H. Wallace, an ARCO Commission Tank Truck Distributor, to be "wholesale purchaser-resellers." [4] Before discussing the merits of ARCO's arguments, it will be useful to examine each of the administrative proceedings challenged.[5]

## B. FACTUAL BACKGROUND

### 1. *The Boyett Proceedings.*

On March 17, 1975, Mr. Stanton W. Boyett, president of Agents Alliance, a group of ARCO Commission Distributors, sent a copy of his contract (ARCO Form RD 537 Rev. 1–68), under which he and most other ARCO Commission Distributors operate, to the FEA and requested an interpretation as to their status as "wholesale purchaser-resellers." Pursuant to 10 C.F.R. § 205.80, the FEA issued a letter of interpretation concluding that "any firm which is in the business of selling and distributing allocated products under the terms of the Commission Distributor Agreement submitted . . . operates as a functional entity that is sufficiently independent of its supplier to qualify as a wholesale purchaser reseller . . . ." [6]

After learning of the issuance of this interpretation, ARCO filed an appeal pursuant to 10 C.F.R. § 205.100 on June 3, 1975. The appeal contested the factual basis of the Boyett interpretation and requested a hearing regarding the appeal pursuant to 10 C.F.R., part 205, subpart M. ARCO also

**4.** There is very little difference between a Commission Distributor and a Commission Tank Truck Distributor. Boyett and Wallace operate under virtually identical contract agreements except that Boyett as a Commission Distributor is granted an exclusive territory in which Atlantic Richfield provides a "by-pass" commission for any deliveries made therein by Atlantic Richfield. Wallace as a Commission Tank Truck Distributor has no right to such by-pass commissions.

**5.** We should make clear from the outset that this court rejects defendants' and intervenors' assertion that ARCO is precluded from challenging these proceedings because it did not immediately seek review of the Wallace and Boyett interpretations in this court. As inter-

venors concede in a supplemental memorandum, present federal energy regulations contain no time limit within which an appeal to the federal district court must be filed. Moreover, this court is aware of no factors which would make it appropriate to bar ARCO's review of these proceedings by invoking the doctrine of laches.

**6.** The interpretation also stated that it was "limited to those ARCO distributors which operate under the Commission Distributor Agreement described [therein] and shall not be construed to apply to any relationship where the existence of other agreements, amendments, modifications or practices of any kind have the effect of changing the relationship . . . ."

submitted a detailed line-by-line analysis of the ARCO Commission Distributor Agreement under which Boyett was operating in an effort to show that Boyett was not a wholesale purchaser-reseller.

On June 18, 1975, Agents Alliance responded to ARCO's appeal. The thrust of their response was to focus on commission distributor agreements that ARCO had previously utilized in an effort to show that ARCO's new commission distributor agreement was merely an attempt to alter the language of the new agreement to create an image of ARCO Commission Distributors as mere delivery agents. Agents Alliance argued in effect that the only people who viewed the Commission Distributors as mere delivery agents were ARCO's legal department who had drafted the new contract. Numerous exhibits were attached from other ARCO departments that indicated that the rest of the corporation, despite the subtle changes in contract language, regarded the Commission Distributors as really performing an independent sales function. Some of these exhibits included memoranda describing ARCO's "bonus barometer program" in which distributors got financial rewards for certain increases in their "sales volume." Also referred to was a pamphlet entitled "You and Atlantic Richfield" in which various selling techniques were discussed. In addition, the response also focused on provisions in the new commission distributor contract that indicated that the Commission Distributor performed more than a delivery function.

Thereafter the FEA wrote ARCO and asked for additional information regarding the Boyett (Commission Distributor)/ARCO relationship. ARCO replied by way of letter on July 9, 1975, in which it conceded that because the Commission Distributor was paid according to the amount of gallons he delivered, there was a built-in incentive for the distributor to develop leads for additional ARCO customers and that it was envisioned to some extent that the distributor function as a "goodwill ambassador." However, ARCO maintained that since the contract did not authorize the distributor to sign any contract on behalf of ARCO, it could not really be said that the distributor was anything more than a delivery agent.

It also appears that the FEA requested Agents Alliance to provide additional information regarding the ability of ARCO Commission Distributors to independently solicit sales. Agents Alliance responded on July 9, 1975, stating: "in checking with the ARCO members of Agents Alliance, almost each one contacted stated that up to 85% of their respective business was solicited solely by the Wholesale Commission Distributor." (Boyett Record at C, p. 8.)

No further materials were submitted by either party. Hence, on August 8, 1975, the FEA issued an opinion denying ARCO's appeal of the Boyett interpretation. This opinion relied on many provisions of the Commission Distributor Agreement and also noted that "an investigation on this appeal has revealed that these distributors solicit new customers and additional sales of ARCO products."

### 2. The Wallace Proceedings.

On October 16, 1975, a Request for Interpretation of the status of Gordon H. Wallace as a wholesale purchaser-reseller was filed with the FEA. On November 5, 1975, ARCO filed extensive comments with the FEA regarding this Request for Interpretation and asked for a hearing. On November 11, 1975, without convening any hearing, the FEA issued a Letter of Interpretation that declared Wallace to be a wholesale purchaser-reseller.

ARCO filed an appeal of this interpretation on December 19, 1975. It basically raised the same arguments that were raised in the Boyett appeal. In addition, ARCO again requested a hearing and asked that the FEA turn over certain documents relating to Wallace's financial and business activities.

On December 30, 1975, the FEA wrote ARCO advising them that a hearing would be convened if the FEA thought it would materially advance the disposition of the issue, and that it would not turn over the data on Wallace since that data was not

considered relevant to the determination of whether Wallace was a wholesale purchaser-reseller. In addition, the FEA requested that ARCO compare the Commission Tank Truck Distribution Agreement that the FEA had examined in conjunction with the Boyett appeal. The FEA also asked ARCO to comment on Wallace's independent ability to solicit sales.

On January 7, 1975, ARCO responded. It objected to the comparison suggested by the FEA because it contended that the *Boyett* decision was limited to its own facts, which ARCO reiterated it had never been given an adequate opportunity to refute. Accordingly, it provided the FEA with a comparison between the Wallace agreement and an Authorized Distributor Agreement used by ARCO with its branded jobbers. Regarding Wallace's solicitation of customers, ARCO stated that:

. . . paragraph 6 of the agreement provides in part "distributors shall not be authorized to sign any contract on behalf of the company . . ." It is obvious that Wallace cannot consummate any sales relationship so that it ripens into a binding sales agreement. Further, because Atlantic Richfield has the sole pricing prerogative and retains inventory control, any meaningful sales solicitation by Wallace is a practical impossibility. Atlantic Richfield is prepared to demonstrate, at the hearing requested in the appeal, that Wallace in fact referred potential customers to Atlantic Richfield Marketing management, requested that prices, credit limits, and available volumes be determined by Atlantic Richfield management, and requested that Atlantic Richfield accept certain individuals as new customers. Wallace Record at F, p. 38.

On January 27, 1976, FEA received a response on behalf of Wallace opposing ARCO's appeal. Wallace also essentially stated the same arguments as those set forth in the appeal of the Boyett Interpretation; however, he additionally took exception to ARCO's portrayal of their relationship by stating that he (Wallace) solicits the customers, negotiates agreements for sales, takes orders and writes up the invoices, ascertains the amount of fuel needed to any given time at the bulk plant, makes sure such oil is supplied by ARCO, contacts customers in cases of dissatisfaction, provides customers with storage facilities and pumps, maintains good will, advertises the availability of product to potential customers of the bulk plant, and pays all expenses of operating bulk plant. Wallace Record at D, p. 17. In addition, it was claimed that although Wallace was not specifically liable for capital repairs by the terms of the agreement he, like most other commissioned tank truck distributors, has made such improvements with ARCO's expressed consent. "He paid to have new storage facilities for 'packaged oils' . . . and also to have the driveway blacktopped after he pointed out its dangerous condition to ARCO and was told there was no money for repair to bulk plants." Wallace Record at D, p. 19. Wallace also noted his participation in the bonus barometer program. Wallace Record at D, p. 22.

On February 13, 1976, the FEA denied ARCO's appeal of the Wallace interpretation. Significantly, the FEA noted that there was insufficient evidence in the record for the regional counsel to have concluded in his letter of interpretation that Wallace qualified as a wholesale purchaser-reseller. However, the agency went on to indicate that by virtue of the data that the parties had submitted during the appeal it could conclude that Wallace in fact had "traditionally functioned in a manner which is similar to a jobber of refined petroleum products" and that he therefore qualified as a wholesale purchaser-reseller. Wallace Record at 11.

On February 19, 1976, FEA received a further submission from ARCO which requested that its February 13 Order be held in abeyance until ARCO received and could respond to information that it had previously requested under the Freedom of Information Act and information which had been submitted on behalf of Wallace. The FEA treated this request as an application for a

stay pending judicial review, which it denied by order issued March 2, 1976. In this order, the FEA explained that it did not think ARCO was entitled to the Freedom of Information Act data that it had requested and that such data was not relevant to its determination that Wallace was a wholesale purchaser-reseller. The FEA did acknowledge, however, the possibility that ARCO may not have received service of Wallace's January 27, 1976, response to ARCO's appeal. Accordingly, the FEA directed that Wallace serve another copy of that response on ARCO and that if, after analyzing that material, ARCO wished to respond, it could request the FEA to reconsider its February 13 decision by filing an application for modification or rescission pursuant to 10 C.F.R., part 205, subpart J. ARCO never filed an application for modification or rescission.

## II

### A. ARCO's MOTION FOR PRELIMINARY INJUNCTION

 "One moving for a preliminary injunction assumes the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Wm. Inglis & Sons Baking v. I.T.T. Con't Baking Co.*, 526 F.2d 86, 88 (9th Cir. 1975). Under the circumstances of this case, this court does not feel that the second standard enunciated above provides an appropriate basis on which to issue a preliminary injunction.[7] Accordingly, if plaintiff is to prevail on its motion, it must meet the first of the two burdens described above.

### 1. *Irreparable Injury.*

 Plaintiff ARCO contends that as a result of the FEA's reliance on the interpretations challenged herein, it has been, and

will be, subjected to substantial civil and criminal penalties. ARCO points *inter alia* to the FEA's issuance of a Notice of Probable Violation (NOPV) against it on April 6, 1976, in connection with its termination of the Bellingham, Washington, distributorship of Mr. T. H. Harner without FEA approval. This conduct was alleged to have constituted a violation of 10 C.F.R. 211.-9(a)(1). The NOPV concluded that Mr. Harner was a wholesale purchaser-reseller on the basis that he was operating under the same commission distributor contract as Mr. Boyett.

While the FEA effectively concedes that it will continue to issue NOPV's against ARCO as long as ARCO persists in terminating its Commission Distributors without FEA approval, it maintains that the possibility that ARCO will receive future NOPV's is not sufficient to constitute irreparable injury. The FEA reasons that a NOPV will not itself subject ARCO to civil and criminal penalties as will a remedial order. *Compare* 10 C.F.R. 205.191 *with* 10 C.F.R. 205.192.

These regulations indicate that a NOPV is simply a notice to a party that it may be violating FEA regulations. It in no way constitutes a final decision and specifically envisions a reply. Only if a reply is not filed as required, or if upon reply the FEA finds that a violation has occurred, does a remedial order issue. It is this remedial order that serves as a decision which causes liability to attach and which sets off enforcement mechanisms.

We do not, however, see how the distinction between a NOPV and a remedial order is relevant here. While the issuance of a NOPV may not immediately lead to the imposition of civil and criminal penalties, it, not unlike an indictment, forces its recipi-

---

7. At the oral argument of these motions, both defense and intervenors' counsel persuasively argued that many Commission Distributors, most of whom have been associated with ARCO for several years, would be unfairly, and possibly unlawfully, forced to close their businesses were this court to issue the preliminary injunction sought by ARCO. Moreover, there was also argument that granting the preliminary injunction would adversely affect hundreds of farmers primarily located in the San Joaquin and Imperial Valleys. Thus, whatever hardships face ARCO, this court cannot say that "the balance of hardships tips sharply in ARCO's favor."

ent to answer charges which may ultimately result in the imposition of those sanctions that plaintiff fears. Moreover, it must be remembered that ARCO is alleging that the interpretations that the FEA has relied on to subject ARCO to administrative proceedings which it otherwise would not be subject to, are invalid. Accordingly, if such regulations are in fact invalid, this court is of the opinion that ARCO should be able to enjoin the FEA from relying upon them. Thus, we feel that ARCO has shown the requisite "possibility of irreparable injury" to entitle it to a preliminary injunction if it can show that it is reasonably likely to prevail on the merits of its claim. It is to this latter question that we now turn.

### 2. *Likelihood of Success on the Merits.*

ARCO contends that the Boyett and Wallace interpretations are invalid because (a) they were made without affording ARCO the rudimentary protections of due process; (b) they are not supported by substantial evidence; and (c) they are in excess of the FEA's statutory authority. We will deal with these contentions seriatim.

a. *Due process.* The thrust of ARCO's due process claim is that it never had an adequate opportunity to examine and rebut the evidence that the FEA relied on in declaring Boyett and Wallace to be wholesale purchaser-resellers. More specifically, ARCO complains of being denied an opportunity to participate in the procedure involving the issuance of the Boyett interpretation. Moreover, with respect to the Boyett appeal, ARCO argues that it never had an opportunity to contest or examine the validity of the Agent's Alliance survey which indicated that almost all of that organization's members had developed a substantial amount of their own sales. With respect to the Wallace appeal, ARCO similarly complains of the failure of the FEA to afford it a hearing at which ARCO could challenge some of the written submissions offered on behalf of Wallace and at which ARCO had offered to demonstrate that Wallace in fact referred potential customers to ARCO management, requested that

prices, credit limits, and available volumes be determined by ARCO management, and requested that ARCO accept certain individuals as new customers. Wallace Record at F, p. 38.

■ Before we evaluate the merits of ARCO's contentions, it is important to clarify the context in which we will pass on ARCO's due process claim. Section 5 of the EPAA explicitly incorporates section 211 of the Economic Stabilization Act of 1970 (hereafter "ESA"), of which subsection (g) provides that only the Temporary Emergency Court of Appeals (hereafter "TECA") may pass upon "substantial" constitutional questions arising from the operation of the EPAA or orders and regulations issued thereunder. Section 211(c) requires this court, if it determines that there is a "substantial" constitutional question, to certify such a question to TECA. Constitutional questions are not substantial if they are obviously without merit or if previous decisions have foreclosed the issues. *Delaware Valley Apartment House Owner Association v. United States*, 350 F.Supp. 1144 (E.D.Pa.1972), *aff'd per curiam* 482 F.2d 1400 (Em.App.1973). Thus, our task here is to determine whether plaintiff's due process claims are substantial enough to warrant their certification to TECA. In addition, although defendant FEA appears to argue to the contrary, if this court is not only of the opinion that plaintiff's claims warrant certification, but that plaintiff is likely to prevail upon them, it would seem that we may, in our discretion, issue the preliminary injunction requested. However, we need not actually reach this issue since, as the remaining portion of this section indicates, we do not feel that ARCO's due process claims warrant certification to TECA.

■ Initially, there is some question as to whether ARCO has a sufficient property interest in the appeals of the Boyett and Wallace interpretations to have been entitled to the protections of due process. While ARCO was clearly aggrieved by those FEA interpretations, not every person aggrieved by administrative action is necessarily entitled to the protections of due

process. *See Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Here, ARCO contends that the FEA's rulings that ARCO Commission Distributors are wholesale purchaser-resellers has, and could have been contemplated to have, imposed upon ARCO significant restrictions in the manner which ARCO enforces its contracts and distributes its petroleum. Therefore, it is ARCO's position that the FEA was obligated to extend due process protections to ARCO in adjudicatory proceedings leading to the Boyett and Wallace decisions. Assuming this to be so, the real question raised by ARCO's claim is whether the process that it was afforded is the process that it was due.

██ Relying on a group of cases dealing with administrative decisionmaking, ARCO contends that "where adjudicative facts are in dispute [an administrative agency], is required to accord a full hearing to interested parties who present a material factual contest to such applications." *Independent Bankers Ass'n v. Board of Governors,* 170 U.S.App.D.C. 278, 516 F.2d 1206, 1217 (1975). *See Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Ohio Bell Telephone v. P.U.C.,* 301 U.S. 292, 300, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); *Langevin v. Chenango Court Inc.,* 447 F.2d 296, 300 (2d Cir. 1971); *Adams v. Witmer,* 271 F.2d 29, 33 (9th Cir. 1959). However, due process is a flexible concept which depends upon a balancing of competing interests. *See e. g., Cafeteria and Restaurant Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Accordingly, the FEA stresses that we are dealing here with regulations and decisions implementing an emergency statute passed by Congress to deal with the serious energy problems confronting the nation.

The FEA argues that a series of decisions from TECA indicate that in the context of the broad based Economic Stabilization Program, agency action taken pursuant to the ESA is not subject to the strict procedural due process requirements of notice and full adversary hearing. *See Carpenters 46 et al. v. Construction Industry Stabilization Committee (CISC),* 522 F.2d 637 (Em.App.1975); *Plumbers Local Union No. 519 et al. v. Construction Industry Stabilization Committee,* 479 F.2d 1052, 1055 (Em.App.1973); *Western States Meat Packers Ass'n v. Dunlop,* 482 F.2d 1401 (Em.App.1973). Indeed the FEA notes that section 207 of the ESA specifically exempts agency action from many provisions of the Administrative Procedure Act, including 5 U.S.C. § 556 regarding the conduct and rights of participants to administrative hearings.[8]

In *Carpenters 46,* a leading case in this area, the defendant Construction Industry Stabilization Committee, established by the President pursuant to the ESA to approve all proposed wage and salary increases in the construction industry, reduced certain wage increases that the union had negotiated for in their collective bargaining agreement. The union, thus, sought declaratory and injunctive relief that the CISC's action was unlawful and unconstitutional. Upon motions for summary judgment in this court, Judge Zirpoli determined all matters in controversy against the union except a procedural due process claim which he certified to TECA. Although, actually ruling that the case was moot, TECA made a special point to indicate "the tenuous nature of [its] jurisdiction based upon certification of what appear[ed] to be an insubstantial constitutional issue." 522 F.2d at 637. The court continued,

> Plaintiffs would assert that the non-adversary nature of the administrative hearing held by CISC in their case denied

---

8. FEA was exempted from such procedures because:

The Committee felt that these requirements for administrative review were sufficient to insure that all aggrieved persons . . . if aggrieved by the operation of any of the regulations or orders of the agency to be able to know how to complain and what to do about it. To require these emergency agencies to follow all the requirements of the APA seemed too cumbersome and dilatory a procedure. Senate Banking Committee Report No. 92–507, CCH Energy Mgmt., Vol. 2, ¶ 10,659.

them their constitutional right of "procedural due process." However, this Court has previously recognized the important distinction of agency determinations under the ESA from the "usual administrative adjudications, subject to the full panoply of the Administrative Procedure Act.

and cited *Plumbers Local Union case, supra. Id.* at 639 (footnote omitted). The court then turned to a discussion of the *Western States Meat. Packers* case *supra,* which involved a due process challenge to the imposition of a freeze on beef prices by the Cost of Living Council. Although recognizing that *Carpenters 46* did not involve, as *Western States* did, the failure to hold formal public hearings on the proposed agency action, the court stated that the factors considered in *Western States* —namely, the use of informal consultations, the possibility of counter-productive economic effects, and the impracticability due to the emergency confronting the COLC—were nevertheless clearly relevant in determining the adequacy of the hearing procedures available to parties objecting to the ESA and its regulations. 522 F.2d at 639.

Thus, relying on *Carpenters 46* and the cases cited therein, FEA argues that TECA has foreclosed the procedural due process claims raised by ARCO. It also relies on a recent unreported district court decision, *Wentz Heating and Air Conditioning Co. v. FEA,* 410 F.Supp. 1155 (D.Neb.1976), in which that court held that petitioner's allegations that it had been denied due process were foreclosed by the very TECA decisions that the FEA relies on here.[9]

In rebuttal, ARCO argues that the energy crisis is not the type of emergency situation that can justify the FEA's denial of ARCO's due process rights. ARCO relies on the recent Committee Report on the Energy Policy and Conservation Act of 1975, excerpted at U.S.Code Cong. & Ad. News, pp. 1762, 1817 (1975) as follows:

There is no longer a general shortage of either crude oil or refined petroleum products . . . . Independent marketers are, once again, finding major refiners receptive to running their refineries at higher through-put rates to achieve lower unit costs. These refiners are willing to sell surplus to independent marketers. Independent marketers are, therefore, now finding supplies readily available.

Nevertheless, Congress did not choose to suspend the federal energy regulations now sought to be enforced. Rather, the Energy Policy and Conservation Act specifically extended most aspects of the EPAA.

ARCO, however, also points to a number of cases which have held in varying circumstances that the so-called "emergency situation" upon which the Stabilization Act was predicated was not sufficient to exempt the COLC or FEA from complying with various rule-making procedures of the Administrative Procedure Act, set forth at 5 U.S.C. § 553. *See e. g., Tasty Baking Co. v. COLC,* 529 F.2d 1005 (Em.App.1975); *Shell Oil v. Federal Energy Administration (Zarb),* 527 F.2d 1243 (Em.App.1975); *Consumers Union v. Zarb,* 523 F.2d 1404 (Em.App.1975); *Nader v. Sawhill,* 514 F.2d 1064, 1069 (Em. App.1975).

Section 211 of the Stabilization Act, incorporated into the EPAA by § 5(a)(1) of that Act, explicitly provides that agency action would be subject to the requirements of 5 U.S.C. § 553. That section provides for certain rule-making procedures to be followed unless "the agency for good cause finds . . . notice and public procedure thereon impracticable, unnecessary or contrary to the public interest." The cases referred to by ARCO generally involved agency attempts to excuse their failure to comply with these rule-making procedures because of good cause—to wit, the existence of emergency situations. TECA has

---

**9.** In that case, the FEA claimed that Wentz charged higher than the maximum permissible prices for No. 5 Fuel Oil under relevant FEA regulations. Although Wentz admitted the violation, it claimed that since it was only granted informal conferences with federal officials rather than a full scale adversary hearing, it was denied due process. The court held that *Carpenters 46* and the cases cited therein foreclosed these contentions.

almost consistently ordered that the rule-making procedures be followed, reasoning *inter alia* that Congress was aware of the emergency situation when it enacted the Stabilization Act and yet still decided to make the agencies comply with the rule-making procedures specified in section 553. *See e. g., Tasty Baking Co. v. COLC, supra,* 529 F.2d at 1015. However, since Congress specifically excused agency action from complying with the requirements governing administrative hearings, specified in 5 U.S.C. § 556, we do not find those cases persuasive here.

ARCO also seeks to distinguish the TECA decisions which the FEA claims foreclose the procedural due process issue. ARCO contends that in contrast to the instant case, none of the administrative decisions cited by the FEA turned on a precise determination of the facts by the agency in question. In the *Carpenters 46* case, for instance, ARCO contends that plaintiffs appeared to challenge a regulation rather than the fact-finding procedure used to determine if a regulation was applicable in a particular instance. We disagree with this reading of the *Carpenters 46* decision and do not find the distinctions that ARCO makes with regard to the other decisions relied on by FEA to be compelling in view of the fact that, in *Carpenters 46,* TECA considered such cases to be persuasive authority notwithstanding their somewhat different factual setting. See 522 F.2d at 639.

While the exact basis of the union's due process claim is difficult to discern in the TECA decision in *Carpenters 46,* Judge Zirpoli's decision certifying the question to TECA, clearly indicates that plaintiffs central claim was that "they were constitutionally entitled to an opportunity to rebut the evidence upon which CISC based its determination." More specifically, Judge Zirpoli analyzed the parties' due process contentions as follows:

> Defendants contend that plaintiffs have had as full an opportunity to a hearing as the Constitution requires. They point out that prior to the June determination representatives of plaintiff met with representatives of CISC to discuss the proposed increases . . . . .
>
> . . . Plaintiffs contend additionally that while they were permitted to inspect the data in the CISC files relating to their contract, they were unable to make sense of the contents of the files because the files were in such disorder. Under these circumstances their opportunity to present evidence was severely circumscribed by their inability to determine what evidence CISC would rely upon in reviewing their case. [Decision filed April 22, 1975, p. 30.]

It was on this claim that Judge Zirpoli certified the case to TECA, writing:

> While the court is mindful of the counter-balancing interests in the nation in efficient administration of the Economic Stabilization Program and bona fide attempt by CISC to permit plaintiffs to make their views known, the court cannot conclude that plaintiffs' right-to-hearing arguments are without merit. It therefore must defer to the judgment of the TECA and certify this issue to the appellate court. [Id. at 31]

■ Thus, an examination of Judge Zirpoli's decision indicates that contrary to defendant's assertion, the due process claim that plaintiffs were advancing in *Carpenters 46* is very similar to the claim now advanced by ARCO—that it was constitutionally entitled to, but was denied, an opportunity, by way of a hearing, to rebut the evidence upon which the FEA relied. Yet, as indicated previously, though only dicta, TECA clearly expressed its view that Judge Zirpoli had certified what appeared to TECA to be "an insubstantial constitutional question." Accordingly, this court is constrained to conclude that TECA has foreclosed the procedural due process claim that ARCO seeks to advance here.

b. *Substantial evidence.* Section 211 of the Stabilization Act, incorporated into the EPAA by section 5 of that statute, sets forth the appropriate standard for the review of agency orders:

no order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.[10]

■ Substantial evidence is such relevant evidence "as a reasonable mind would accept as adequate to support a conclusion." *Consolidated Edison Company v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Such evidence "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *United States v. Wharton,* 514 F.2d 406, 409 (9th Cir. 1975).

■ As is set forth in section I(B) of this opinion, both sides submitted a great deal of data on the question of whether Boyett and Wallace were wholesale purchaser-resellers. ARCO's argument that the FEA determinations are not supported by substantial evidence is based upon the FEA's admission in the Wallace appeal that the commission distributorship agreements in and of themselves did not provide a sufficient basis on which to determine whether Wallace and Boyett were wholesale purchaser-resellers. Rather, the decision required additional evidence to show that Wallace and Boyett had a substantial degree of independent control over the sale and distribution of refined products. It is the substantiality of this evidence which ARCO basically contests. Yet reviewing the evidence presented to the FEA, we cannot say that their decision was not supported by substantial evidence.

With respect to the Boyett interpretation, the FEA had evidence that indicated Boyett and almost all other ARCO members of Agents Alliance stated that up to 85% of their respective business was solicited and developed solely by the Wholesale Commis-

sion Distributor. Boyett Record at C, p. 8. Similar evidence was placed before the FEA with respect to the Wallace appeal. Wallace Record at D, p. 21. That evidence also indicated that Wallace negotiated agreements for sales, took orders and wrote up invoices, ascertained the amount of fuel needed at any given time at the bulk plant, contacted customers in case of dissatisfaction, provided customers with storage facilities and pumps, maintained good will, advertised the availability of product to potential customers of the bulk plant, and paid all expenses of operating the bulk plant. Wallace Record at D, p. 17. While it is true that these statements were set forth in the form of letters to the FEA written by counsel, rather than in sworn affidavits signed by the respective parties, this seems to be the normal manner in which the FEA received evidence. Accordingly, we are unwilling to hold that such evidence is insubstantial merely because FEA procedures do not require that such submissions conform to the requirements of rule 56(e) of the Federal Rules of Civil Procedure. Moreover, while ARCO now attacks such evidence as merely constituting the unsupported statements of counsel, it is significant to note that ARCO never submitted any documents of any kind to the FEA which attacked those statements or attempted to refute them.[11]

In addition to the evidence just described, the FEA also relied on a pamphlet entitled "You and Richfield," a Commission Distributor's Manual that each distributor receives when he commences work for ARCO. That pamphlet opens with the following remarks:

> While you are an independent businessman and not an employee, which may be well known to all people, you will nonetheless be regarded and treated as Mr. Richfield in your community . . .

---

**10.** ARCO's contention regarding the FEA's lack of statutory authority is discussed in section c. *infra.*

**11.** As indicated previously, ARCO contends that it was never in timely receipt of the submission of such data made on behalf of Wal-

lace. Nevertheless, when eventually served with that data and given the opportunity to seek modification or rescission of the FEA's decision with respect to Mr. Wallace, ARCO declined to so move.

Without exception, experience has shown that those who obtain success usually possess several basic qualifications: the ability to think and work, ambition tempered with judgment, sales ability, determination, ingenuity and character of the highest type. Boyett Record at E, p. 48. Section 7 of the pamphlet deals only with selling and offers various selling tips.

ARCO now attacks the FEA's reliance on this publication, noting that the pamphlet was last published in 1962, and contending that its description of the Commission Distributor antedates the present relationship of ARCO's Commission Distributors with the company. Yet, while the pamphlet may not have been recently reprinted, there is no indication that it was removed from circulation or that ARCO's Commission Distributors were discouraged from utilizing it.

The FEA also relied on the existence of a "bonus barometer" program which until terminated in 1972, provided a means for ARCO Commission Distributors to get an extra bonus if "the Agent's total product sales volume for the current year [showed] an increase of ten percent (10%) or more over his total product sales volume for the preceding year. ARCO now attacks the FEA's reliance on this evidence arguing, that while the documents relied on refer to "sales volumes" and explain the condition which must be met to qualify for bonuses, they in no way state that the Commission Distributor actually sells product to customers. This omission, however, in this court's opinion does not render such evidence insubstantial.

As the Temporary Emergency Court of Appeals said in *Pasco Inc. v. FEA*, 525 F.2d 1391 (Em.App.1975),

In reviewing the discharge of an agency's function in interpreting the [EPAA], promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that where administrative control has been congressionally authorized, the "judicial function is exhausted when there is a rational basis for the conclusions approved by the ad-

ministrative body." 525 F.2d at 1400 (citations omitted).

Administrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise and this court should not be quick to overturn them. 525 F.2d at 1404.

Accordingly, we find ARCO's contention that the FEA's decisions lacked substantial evidence to be without merit.

c. *Excess of statutory authority.* ARCO contends that the regulations promulgated by the FEA regarding wholesale purchaser-resellers exceed the FEA's statutory authority, and, therefore, should be enjoined pursuant to section 211 of the Economic Stabilization Act.

It is readily apparent that one of the major goals of the Emergency Petroleum Allocation Act was to "preserve the competitive viability of . . . branded independent marketers." 15 U.S.C. § 753(b)(1)(D). Congress sought to protect these particular enterprises because of its perception that "they continually spur the major integrated firms to improve their own efficiency in the production, refining, transportation and marketing of products." U.S.Code Cong. & Ad.News, pp. 2582, 2595 (1973). Thus, the EPAA provided for a certain allocation of petroleum products to such branded independent marketers who are defined in the statute as persons who are "engaged in the marketing or distributing of refined petroleum products . . . but who are not affiliated with, controlled by, or under common control with any refiner . . . ." other than by means of a supply, trademark, or agreement permitting use of premises controlled by a refiner. 15 U.S.C. § 752(1).

Drawing upon this legislative analysis, ARCO argues that the FEA has impermissibly broadened the scope of the statutory definition of "branded independent marketer" by including within its reach not only a firm which purchased and resold petroleum products, but also one which otherwise obtains, as by consignment, an allocated prod-

uct and resells or otherwise transfers it to other purchasers without substantially changing its form. Thus, ARCO appears to argue that if in fact its Commission Distributors are wholesale purchaser-resellers, that classification is irrelevant since the FEA has exceeded its statutory authority in creating it.

 It is well established that administrative construction of applicable statutes and regulations promulgated thereunder are entitled to great weight. As the Supreme Court said in *Power Reactor Development Co. v. Int'l Union of Electrical Radio and Machine Workers*, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961):

> We see no reason why we should not accord to the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administration construction of a disputed provision. Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." [367 U.S. at 408, 81 S.Ct. at 1535.]

Also *see Mourning v. Family Publications Service*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1972); *Thorpe v. Housing Authority of the City of Durham*, 386 U.S. 670, 673, 87 S.Ct. 1244, 18 L.Ed.2d 394 (1967); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *F.T.C. v. Mandel Brothers*, 359 U.S. 385, 391, 79 S.Ct. 818, 3 L.Ed.2d 893; *Pasco Inc. v. FEA*, 525 F.2d 1391, 1400 (Em.App.1975); *Review Committee v. Willey*, 275 F.2d 264, 272 (8th Cir. 1960).

 Here it appears that the FEA has issued a regulation defining the term "wholesale purchaser-reseller" which is both reasonable and consistent with the EPAA's purpose to equitably distribute crude oil at equitable prices among all re-

gions of the United States and all sectors of the petroleum industry. As the FEA made clear in a 1975 energy ruling,

> The phrase "as by consignments" is included in the definition of a wholesale purchaser-reseller to make clear that firms which obtain and resell or otherwise transfer allocated product are not automatically excluded from the definition solely on the ground that they fail to take legal title to the product. This phrase explicitly recognizes the fact that consignment relationships have long existed in the petroleum industry under which consignees performed essentially the same functions as jobbers and that such consignees should be treated under the allocation regulations in the same manner as jobbers. [FEA Ruling 1975–8, 2 FEA ¶ 16,048 (1975).]

Moreover, it is significant that Congress has extended the EPAA on three occasions and has never sought to modify or eliminate the FEA's definition of "wholesale purchaser-reseller."[12] Thus, this court is of the opinion that in promulgating the regulation defining "wholesale purchaser-reseller" the FEA has not exceeded its statutory authority under the EPAA.

ARCO also argues that the FEA's decisions are in excess of its statutory authority because by wrongly declaring its Commission Distributors to be wholesale purchaser-resellers, and thereby subjecting them to other FEA rules and regulations, the FEA has disturbed the existence of ARCO's contractual rights without effectuating the purposes of the statute. *See Trans World Airlines Inc. v. FEO*, 380 F.Supp. 560, 565 (D.D.C.1974). This argument is also without merit.

**B. DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

As is set forth clearly above, this court is of the opinion that ARCO will not prevail on the merits of any of the claims which it

---

**12.** P.L. 93–511 (December 5, 1974); P.L. 94–99 (September 29, 1975); P.L. 94–133 (November 14, 1975).

advances. Moreover, having reached this conclusion only after carefully reviewing the administrative record, as well as the affidavits and memorandum of law submitted by the parties, we do not think that further proceedings in this matter would be illuminating. In its written response to defendant's motion for summary judgment, ARCO simply referred to its discussion of the merits in its Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction filed on April 12, 1976, and implicitly took the position that there were no material questions of fact in dispute and that the case should be decided on its merits.

We note, however, that at the oral argument of these motions ARCO took a somewhat different position. At this time ARCO submitted the affidavit of Peter R. McEnroe, senior attorney for Atlantic Richfield. This affidavit indicated that the FEA had finally replied to ARCO's Freedom of Information Act Request for all materials relied upon by Dave Wharton III, Regional Counsel for Region IX, in rendering in interpretation of Gordon H. Wallace's Commission Tank Truck Distributor Agreement. The list of such materials which was provided to ARCO and which is attached to the McEnroe affidavit, include a number of documents that do not appear in the administrative record which was furnished to this court. Thus, ARCO seems to imply that the court cannot determine that the FEA's decisions were supported by substantial evidence when it is not even clear exactly what evidence the FEA relied on in making those determinations. Also implicit in this charge is the assertion that ARCO was denied due process by virtue of the fact that the FEA relied on material outside the administrative record without affording ARCO any opportunity to comment.

 These contentions, however, are based on an erroneous view of the function and effect of a letter of interpretation that is issued pursuant to 10 C.F.R. Part 205, subpart F. A letter of interpretation is merely the opinion of the FEA General or Regional Counsel as to the manner in which particular FEA rulings or regulations will be applied to a particular factual situation. Accordingly, the FEA does not consider, nor does it appear to this court, that the issuance of a letter of interpretation is an adjudicatory process to which potentially aggrieved parties are entitled to notice and an opportunity to be heard. Rather, under FEA regulations, a party who is aggrieved by a particular interpretation may appeal that interpretation and submit its views to the FEA as provided in 10 C.F.R. 205.100 *et seq.* This is of course exactly what ARCO did here.

 Thus, the data that the regional counsel relied on in issuing his letter of interpretation to Mr. Wallace is not relevant here and was properly excluded from the administrative record. The fact that the regional counsel relied on evidence different than that relied on by the FEA's Office of Exceptions and Appeals in denying ARCO's appeal in no way infringes ARCO's due process rights nor precludes this court from deciding that the Wallace decision was supported by substantial evidence. Consequently, this court is of the view that defendant's motion for summary judgment is appropriate and that it should be granted.

### III

Accordingly, it is hereby ordered that plaintiff's motion for a preliminary injunction be denied and that defendants' motion for summary judgment be granted.

IT IS SO ORDERED.